THE BAY COMPANY, PETITIONER, *v.* RENEGOTIATION BOARD, RESPONDENT.

Docket No. 952–R.   Filed July 30, 1962.

*James V. Ramsdell, Esq.,* for the petitioner.
*Andrew P. Vance, Esq.,* for the respondent.

FISHER, *Judge:* Petitioner, for the purpose of contesting an order of the Renegotiation Board, upon renegotiation of its contracts, that $50,000 of its profits for the fiscal year ending September 30, 1952, was excessive, by this proceeding, seeks a redetermination thereof.

The contested issues relate to the amount of overhead expenses attributable to these renegotiable contracts, and the extent if any to which the profits were excessive.

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

Petitioner, during all times material herein, was and is a corporation organized under the laws of the State of Washington, engaged primarily as an engineering contractor in design, installation, and maintenance of industrial piping and plumbing.

During all times material herein, the books and records were maintained and Federal income tax returns of petitioner were filed using the completed contract basis of reporting income and expenses, and petitioner maintained a fiscal year ending September 30.

The capital stock of petitioner was owned, during all times material herein, 99 percent by the Tide Company, a Washington corporation, engaged in industrial electrical design, installation, and maintenance work. The four shareholders of the Tide Company, during all times

material herein, have been the only officers of both the Tide Company and petitioner.

For the fiscal years prior to 1952, petitioner realized the following profits or losses:

| Year | Sales | Profit or loss | Percent of profit to sales |
|------|-------|----------------|------------------------------|
| 1948 | $34, 683. 46 | ($8, 228. 23) | Loss |
| 1949 | 405, 542. 15 | 124, 997. 47 | 30. 8 |
| 1950 | 905, 550. 92 | 133, 733. 98 | 14. 8 |
| 1951 | 540, 568. 85 | 87, 049. 85 | 16. 1 |

During the fiscal year ending September 30, 1952, petitioner completed numerous short-term contracts (fully completed during the fiscal year) and seven long-term contracts (work commencing in a prior fiscal year). Four of the seven long-term contracts which were completed during the fiscal year were subject to renegotiation.

For the fiscal year ending September 30, 1952, petitioner's books (including later agreed adjustments) reflect the following income and expenses concerning all contracts completed during that fiscal year.

| | Renegotiable | Nonrenegotiable | Total |
|------|-------------|-----------------|-------|
| Sales | $1, 998, 933. 40 | $961, 762. 24 | $2, 960, 695. 64 |
| Direct costs | 1, 525, 235. 50 | 1, 006, 617. 50 | 2, 531, 853. 00 |
| | $473, 697. 90 | ($44, 855. 26) | $428, 842. 64 |
| Overhead | 126, 101. 38 | 99, 427. 71 | 225, 529. 09 |
| | $347, 596. 52 | ($144, 282. 97) | $203, 313. 55 |
| Misc. expenses | 1, 350. 00 | 12, 044. 00 | 13, 394. 00 |
| Net profit | $346, 246. 52 | ($156, 326. 97) | $189, 919. 55 |
| Percentage of profits to sales | 17. 32% | Loss | 6. 4% |

The major long-term nonrenegotiable contracts completed during that fiscal year involved the Mountain View Sanitorium and the Animal Industries Building for the State of Oregon. Both projects commenced in 1950.

Petitioner's books reflect a loss on the Animal Industries Building contract of $63,450, and a loss on the Mountain View Sanitorium contract of $114,488.53. The losses were due mainly to the fact that both contracts were bid under very competitive conditions, and under hurried circumstances; that the subsequent start of the Korean conflict resulted in difficulties in material procurement inasmuch as they were not priority projects; delays in delivery of equipment; increase in prices of supplies and labor which were not foreseen; the loss of a subcontractor; and a defect in delivered equipment. Both contracts were

supervised by petitioner's usual employee supervision and visited and supervised by two of its officers.

Subsequent to the commencement of work on the two aforementioned contracts in 1950 and after some of the many difficulties in regard to these jobs had already presented themselves, petitioner was awarded four contracts, subject to renegotiation, which were completed during the fiscal year ending September 30, 1952. These contracts were as follows:

| Contract | Location |
| --- | --- |
| Hot semiworks_____ | Hanford, Washington |
| Evaporator_____ | Hanford, Washington |
| Air Force Base_____ | Arlington, Oregon |
| Air Force Base_____ | Fairbanks, Alaska |

The largest of these four contracts, accounting for approximately 90 percent of petitioner's total profits for that fiscal year, was the "hot semiworks" project in Hanford, Washington (hereinafter sometimes referred to as the Hanford contract). This contract was a subcontract with L. H. Hoffman Company, which in turn was a subcontractor to the General Electric Company in connection with a project for the Atomic Energy Commission. The contract involved building a large-scale pilot plant to test a new processing theory for some of the radioactive materials produced at Hanford, Washington.

The Hanford contract was awarded in February 1951, on a lump-sum basis in competitive bidding in the amount of $1,763,000. The next two lowest bids for the contract were in the amounts of $1,875,000 and $2,304,000. Petitioner's contract amount was later increased due to specification changes and the wage escalation clause to $1,859,034.34.

The Hanford contract required the use of highly critical materials which were predetermined to be of an extremely high quality so that they would have a long life in a process involving highly radioactive substances. Such project required a great amount of technical knowledge and ingenuity inasmuch as it presented highly complex problems in an area new in development.

Petitioner had difficulty in procuring materials that were originally specified because of governmental regulations. The original specifications for stainless steel in the project were prohibited by Executive order. Petitioner was required to resort to substituted materials with no changes in the quality requirements. It was also forced to use materials of one type which were new in technology, the technique of making them not being yet perfected. It was necessary for petitioner to work with and assist its suppliers in numerous cases obtaining for them raw materials to make the various pieces of machinery products which were required. In preparing its estimate for costs, petitioner included a contingency factor to provide for uncertainties in obtaining

materials. The actual expenses were $87,702 less than that which it had allowed in its estimate.

One item of equipment needed, known as a slug charger, was specially designed by the General Electric Company with extremely high and rigid requirements. Believing that the cost of having one manufacturer assume complete responsibility for this item would be prohibitive petitioner assumed this responsibility itself, and went to several sources of supply, machine shops, raw material suppliers, and was successful in having the devices manufactured under its own supervision.

The total cost of all subcontracting in connection with this contract was $390,000, or approximately one-fourth of the total direct costs.

Except for the hiring of a single engineer, the same four officers provided management supervision to all of petitioner's and its parent corporation's work during the fiscal year ended September 30, 1952.

The four corporate officers of petitioner made trips to various places in the United States in working out design problems and procuring materials for petitioner and manufacturers of equipment. Of the 15 suppliers on the Hanford project, 13 were located in the State of Washington. All four officers spent a considerable portion of their time in connection with the project, thus making it difficult for them to solve many of the problems which arose in connection with the Mountain View Sanitorium and Animal Industries Building contracts. In addition, many of the other personnel at petitioner's Washington office devoted much of their time to the Hanford project.

Petitioner was required to and did work closely with the Atomic Energy Commission, General Electric Company, and the L. H. Hoffman Company.

Petitioner's performance in its renegotiable work was of good quality and petitioner was economical in the use of materials, facilities, and manpower. The procuring and expediting of equipment and materials particularly materials on the critical list was difficult.

Petitioner's parent company and the four officer-shareholders guaranteed the financing of petitioner.

Petitioner, during all times material herein, kept its books and prepared its income tax returns on a basis of accrued costs and completed contracts. The return for each fiscal year showed profits and costs allocated to the contracts for which final payment was received in that year. Under petitioner's normal method of accounting all direct costs were charged to the contract for which they were incurred on a separate job cost ledger sheet maintained for each contract. Upon the completion of a contract all direct costs charged to such contract would be charged to the cost of completed contracts account and be deducted that fiscal year as an expense.

Generally, the Tide Company paid all of the general overhead expense and officers' salaries for both companies. While some of the overhead expenses and salaries were directly charged to a specific contract (as was the practice with direct costs) it was not the general practice to so directly charge overhead expenses or officers' salaries to any particular contract.

At the end of each fiscal year the general overhead expenses (except for the officers' salaries) of both companies which were not previously charged directly to a specific contract were allocated between the two companies in promotion to the total cost of work performed by each during the year.

Also at the end of each fiscal year, the officers' salaries were charged to each company in proportion to the amount of time the officers worked for the two companies.

Of the total officers' salaries charged to petitioner each year, portions were charged directly to specific contracts. The unallocated balance of these salaries would then be added to the general unallocated overhead expense which was charged to petitioner that year.

The following represents the total amount of officers' salaries which were charged to petitioner, the portions of such salaries charged directly to specific contracts, and the total unallocated overhead expenses charged to petitioner for the fiscal years ended September 30, 1951 and 1952.

|  | Fiscal year ended Sept. 30— | |
|  | 1951 | 1952 |
|---|---|---|
| Total officers' salaries charged to petitioner | $30, 931. 08 | $47, 599. 84 |
| Charged to specific contract | 10, 247. 52 | 21, 253. 92 |
| Balance to overhead | 20, 683. 56 | 26, 345. 92 |
| Unallocated general overhead | 108, 999. 25 | 124, 183. 69 |
| Total overhead expense | 129, 682. 81 | 150, 529. 61 |

The record does not disclose to which contract the salaries were directly charged.

The total overhead expense for each fiscal year was then charged to the overhead expense account to be closed into the cost of completed contracts account after all adjustments were made.

If all of the contracts worked on during a particular fiscal year were commenced and completed within that year, all overhead expenses charged to the overhead expense account that year would necessarily have been attributable to completed contracts, and the entire overhead expense account would have been deducted with no adjustments made. Petitioner, in such a situation, did not deem it necessary to allocate the total overhead expense to the individual completed contracts.

Inasmuch as petitioner maintained the completed contract basis for reporting income, only expenses attributable to completed contracts would be closed into the cost of completed contracts account and be deducted for that fiscal year. Therefore, if petitioner had one or more contracts still in process as of the end of a fiscal year, it would allocate overhead expenses to these contracts and defer the deduction of such amounts until the fiscal year in which the contract was completed and the earnings reported. The amount of overhead expenses so allocated would then be removed from the overhead expense account by an adjusting entry and transferred to a deferred overhead account.

Petitioner during all times material herein, including the fiscal year ended September 30, 1952, had consistently applied the direct cost method for allocating overhead expenses to the long-term contracts. Thus, if during a fiscal year there were two contracts in process, contract A involving $1,000 in direct costs and completed during the year, and contract B involving $500 in direct costs, uncompleted during the year, two-thirds of the overhead expenses charged to petitioner that year would be deemed attributable to contract A and left in the overhead expense account to be closed into the cost of completed contract accounts and be deducted. One-third of the overhead expenses would be deemed attributable to the uncompleted contract B and be deferred.

At the end of the fiscal year September 30, 1951, petitioner computed, based upon the direct cost allocation method, the overhead attributable to the uncompleted contracts as of the end of the fiscal year and made the following adjusting journal entry and explanation:

Deferred overhead for contracts in process_____ $102, 197. 26
Overhead applicable to contracts in process _____ $102, 197. 26
"To defer overhead applicable to the following contracts:"

| Job. No. | | Amount [1] |
|---|---|---|
| 3207 | [Animal Industries Building]_____ | $20, 888. 75 |
| 3238 | [Wheeler Apartments] _____ | 5, 947. 29 |
| 3337 | [Air Force, Alaska] _____ | 76. 70 |
| 3220 | [Mountain View Sanitorium]_____ | 33, 647. 81 |
| 3290 | [Hanford contract]_____ | 41, 609. 71 |

¹ The record does not reconcile the discrepancy of $27 between the total adjustment and the total of the itemizations.

The itemized entries were posted to the deferred overhead account. They were not, however, posted to the individual job cost ledger sheets for each of the contracts. The same procedure was followed for the fiscal year 1950.

As of the end of the fiscal year ended September 30, 1952, seven long-term contracts and numerous short-term contracts were completed. Petitioner's accountant calculated, in his working papers, the total amounts of overhead which had been previously allocated to

the long-term contracts in prior years and deferred. These prior years' figures were maintained in the working papers, and also could have been found in the prior years' adjusting journal entries. The previously deferred overhead applicable to these contracts was then transferred out of the deferred overhead account into the cost of completed contracts account to be deducted that year. The adjusting journal entry accomplishing this result itemized the amounts attributable to each contract.

In addition, the accountant determined the amount of overhead expenses incurred during the fiscal year ended September 30, 1952, which should be allocated to these long-term contracts, using the same direct cost method. This computation and itemization was not necessary for any adjusting entry, or for deferral purposes. Such amounts would be left in the overhead expense account and closed into the cost of completed contracts account and treated as a current expense. The itemization was, however, made on a separate sheet and placed in the journal. No allocation of overhead expenses to the long-term contracts was ever posted that year to the individual job cost ledgers.

Of the total unallocated overhead of $150,529.61 charged to petitioner that year, $74,326.61 was allocated to the Hanford project.

No allocation of overhead was made between the individual short-term contracts.

In the fiscal years ended September 30, 1951 and 1953, there were no long-term contracts completed. In 1954, two long-term contracts were completed and the overhead applicable to each (based upon the direct cost method) was posted to the individual job cost ledgers. In 1955, two out of three completed long-term contracts had their overhead allocation posted to their job cost ledgers. In 1956 and 1957, posting of overhead was made to the individual job cost ledger sheets, while none was made in 1958.

The books and records of petitioner reflect the following income and expenses concerning the renegotiable contracts completed during the fiscal year ended September 30, 1952.

| Project | Contract price | Direct costs | Overhead | Profit or loss |
|---|---|---|---|---|
| Hanford contract | $1,859,034.34 | $1,430,961.11 | $115,936.32 | $312,136.91 |
| Evaporator | 92,195.00 | 44,520.65 | 3,824.93 | 43,849.42 |
| Air Force, Oregon | 44,128.54 | 47,699.70 | 6,147.39 | (9,718.55) |
| Air Force, Alaska | 3,575.52 | 2,054.04 | 192.74 | 1,323.74 |
| | 1,998,933.40 | 1,526,585.50 | 126,101.38 | 347,596.52 |
| Miscellaneous expenses | | | | 1,350.00 |
| Total profit from renegotiable contracts | | | | 346,246.52 |

In the initial statement submitted by petitioner to the Renegotiation Board, petitioner computed the overhead attributable to the renegotiable contracts as follows: For the 2 fiscal years ended September

30, 1951 and 1952, it was calculated that 55.91 percent of the total billings of the completed contracts were subject to renegotiation. Petitioner calculated that 55.91 percent of the total overhead expense charged to petitioner for these 2 years would be attributable, therefore, to the renegotiable contracts. This method was a departure from the method consistently used by petitioner on its books and in reporting its income for tax purposes. The total overhead allocated to these contracts on the statement using the aforementioned method was $161,494.30.

On December 13, 1954, petitioner received a letter from the Regional Renegotiation Board which stated, in part, as follows:

> You point out in your submission that direct labor and material costs are accumulated in detailed job cost records. It is also evident from your financial statements that overhead expenses are not charged off in the year incurred but deferred to the year in which contracts are completed. For the purpose of allocating overhead expenses to renegotiable business, however, two accounting periods were combined. In general, *the costs paid or incurred with respect to renegotiable contracts will be those costs allocated thereto by the Contractor's established cost accounting method.* All items of cost will be attributed to the fiscal year in which they are allowable in the determination of taxable income. * * * [Emphasis supplied.]

In response to this letter petitioner submitted to the Board an amended statement of earnings on renegotiable contracts with overhead allocated to them based upon direct costs, in conformity with its books, records, and income tax statements. The total amount of overhead attributable to these contracts was stated to be $126,101.38. In addition, two of the renegotiable contracts not originally reported were added to the amended statement.

The Board accepted this overhead allocation, determined the total profits on renegotiable contracts to be $346,256,[1] and found that petitioner had realized excessive profits in the amount of $50,000. The credit for income tax already paid upon this amount, pursuant to section 1481, I.R.C. 1954, was determined to be $26,000, leaving a balance due under the order of $24,000.

Petitioner's permanent assets account as of October 1, 1951, and September 30, 1952, was as follows:

|  | Oct. 1, 1951 | Sept. 30, 1952 |
|---|---|---|
| Tools and equipment | $11,365.17 | $17,124.22 |
| Autos and trucks | 7,369.47 | 4,922.64 |
| Total | 18,734.64 | 22,046.86 |

Petitioner's net worth or capital account as of October 1, 1951, and September 30, 1952 (before renegotiation), was as follows:

---

[1] The record does not reconcile the discrepancy between this figure and petitioner's profit per books of $346,246.52. Respondent, in brief, however, maintains that the total profit from renegotiable contracts was $346,246.52.

|  | *Oct. 1, 1951* | *Sept. 30, 1952* |
|---|---|---|
| Capital stock | $28,000.00 | $28,000.00 |
| Surplus | 179,411.93 | 216,806.96 |
| Total | 207,411.93 | 244,806.96 |

Petitioner distributed a cash dividend of $50,000 to its parent corporation during the fiscal year ended September 30, 1952.

During the fiscal year ended September 30, 1952, petitioner realized from contracts subject to renegotiation excessive profits in the amount of $20,000.

Upon elimination of $20,000 profits, petitioner's renegotiable operational summary would be as follows:

| | |
|---|---|
| Renegotiable contracts | $1,978,933.40 |
| Costs of contracts | 1,652,686.88 |
| Renegotiable profit | $326,246.52 |
| Percent of profit to sales | 16.5% |

### OPINION.

The main question presented in this proceeding is whether petitioner realized excessive profits from renegotiable contracts in the fiscal year ended September 30, 1952, and, if so, to what extent. Respondent maintains that petitioner's profits on such contracts totaled $346,-246.52 and were excessive in the amount of $50,000. Petitioner contends that it, in fact, realized profits in a lesser amount, and that, in any event, the profits were not excessive. The petitioner has the burden of establishing that respondent's determination of total profits and excessive profits for the fiscal year before us is erroneous. *Stoner Manufacturing Corp.* v. *Secretary of War*, 21 T.C. 200, 208 (1953); *Nathan Cohen* v. *Secretary of War*, 7 T.C. 1002, 1011 (1946).

Concerning the profits realized by petitioner on the renegotiable contracts, the parties are in agreement that the total billing was $1,998,933.40, and that the total direct costs and miscellaneous expenses attributable to them was $1,526,585.50. The sole disagreement on this point centers around the amount of overhead expenses which should be allocated to them.

Section 103(f) of the Renegotiation Act of 1951, as amended, provides that:

Costs shall be determined in accordance with the method of accounting regularly employed by the contractor or subcontractor in keeping his records, but, if no such method of accounting has been employed, or if the method so employed does not, in the opinion of the Board, or, upon redetermination, in the opinion of The Tax Court of the United States, properly reflect such costs, such costs shall be determined in accordance with such method as in the opinion of the Board, or, upon redetermination, in the opinion of The Tax Court of the United States, does properly reflect such costs. * * *

After a financial statement concerning the renegotiable contracts was submitted by petitioner to the Board using an overhead figure differing from that appearing on its books, the Board notified petitioner that, for purposes of computing overhead expenses applicable to these contracts, it should use those costs allocated thereto by petitioner's "established cost accounting method." Pursuant to this letter, petitioner submitted an amended statement, listing overhead expenses attributable to the renegotiable contracts at $126,101.38.

The parties are in agreement concerning the accuracy of this amount under the direct cost method, and the fact that this amount was taken from the books and records of petitioner. Petitioner's main contention, nevertheless, is that such allocation, while taken from its books and records, was not placed there pursuant to a "method of accounting." Petitioner maintains that it has never allocated overhead between all contracts performed by it; that when it does so allocate, such amounts are not posted to the job cost ledgers of such jobs as a consistent policy; that the allocations were made as a result of an "arbitrary formula applied only in part," and that such allocations were made solely for deferral purposes. Therefore, petitioner concludes, it had no "method of accounting" which it is bound to follow, but may now use any method of overhead allocation for renegotiation purposes.

This issue thus narrows down to whether the overhead allocation in fact made on the books and records was the result of a "method of accounting" employed by petitioner. The record discloses that petitioner did not allocate overhead expenses to contracts which were fully performed within 1 fiscal year. The only time petitioner deemed it necessary or of sufficient interest to merit allocation of overhead expenses to a specific contract was when the performance of such contract extended over two or more fiscal years. The four renegotiable contracts in issue here were such long-term contracts and, therefore, were subject to an overhead allocation under petitioner's procedure, based upon the direct cost method.

We attach no controlling significance to petitioner's contention that overhead was allocated to these contracts merely for deferral purposes. Upon the facts of the instant case, we see no occasion to make any distinction between an allocation for deferral purposes and one for the purpose of determining the net profit on a particular contract. Here, in both situations, the aim of the company is to determine, as accurately as possible, what portion of total overhead expenses should be attributable to a particular contract.

Moreover, we cannot accept petitioner's view that the sole reason for its overhead allocation to the contracts in issue was for deferral purposes. The record shows that as of the end of the fiscal year,

September 30, 1952, petitioner's accountant calculated, using the same direct cost method, the amount of overhead expense incurred during that fiscal year which should be allocated to each of the renegotiable contracts. This calculation was obviously not necessary for deferral purposes since the contracts were completed and no further amounts of overhead attributable to them had to be deferred at that time. The allocation of overhead expenses which were incurred during the fiscal year ended September 30, 1952, to the renegotiable contracts was placed on a separate sheet in the journal and was a part of the books and records of petitioner. Such calculation and allocation were the result of a method used by petitioner for determining the total overhead applicable to its long-term contracts apart from the necessity of making such allocations for deferral purposes.

It is an elementary principle of cost accounting that general overhead expenses must be allocated by some consistent method to each unit of production or contract before the net profits on each unit or contract can be ascertained. We think the record demonstrates that, whether or not the descriptive word "deferral" is used, petitioner had such a method and used it in determining net profits.

The fact that the allocations may have been recorded only in the adjusting journal entries and on separate sheets in the journal rather than being properly posted to the job cost ledgers merely indicates an incomplete or arbitrary posting procedure. Petitioner had in prior and subsequent years properly posted such allocations. The failure to follow correct procedure during the year before us does not indicate that petitioner abandoned the direct cost method for the fiscal year 1952. While the accounting procedure then may have been applied arbitrarily, the same allocation method was consistently used.

We also find no significance in the fact, that under petitioner's procedure, it only applied its method of allocating overhead expenses to individual long-term contracts. We have no reason to believe, nor has petitioner so contended, that it would have used a different method if it allocated overhead expenses between all individual contracts. In effect, petitioner did allocate an overhead amount to its short-term contracts based upon their direct costs, this amount being the resulting balance after the overhead was allocated to the long-term contracts. The fact that petitioner did not deem it necessary to break down this balance to each individual short-term contract (as it did for the long-term contracts) is immaterial. The direct cost method was applied, therefore, to all contracts, either directly or indirectly.

Petitioner has consistently employed the direct cost method in allocating overhead expense between its long-term contracts. Pursuant to this method, petitioner's books reflect an allocation to the four renegotiable contracts before us in the amount of $126,101.38. We

believe, therefore, that such figure was properly accepted by the Board in determining the amount of profits actually realized by petitioner from renegotiable contracts for the fiscal year ended September 30, 1952.

Alternatively, petitioner argues that if it did adopt the direct cost method for allocating overhead expenses, such method did not reasonably reflect the overhead costs attributable to the renegotiable contracts before us.

Petitioner concedes that the direct cost method is an acceptable and proper method for allocating overhead expense. Petitioner's accountant, Shull, and another of its witnesses, Miller, an associate professor of economics, testified that the direct cost method employed by petitioner was "a very often used method of allocating overhead," and "an acceptable method * * * that is used by many companies." When Miller was asked the question as to which method "should have been used by petitioner," he prefaced his answer with: "I do not know that I would say 'should have,' but certainly might have." He also observed that overhead can be allocated on "almost any appropriate basis."

Under petitioner's allocation method, overhead attributable to the renegotiable contracts amounted to $126,101.38. Petitioner has offered in evidence the computation of overhead attributable to the renegotiable contracts based upon two other methods. One method, advanced by Miller, would allocate overhead based upon the contract price, direct costs, and profits. Under this theory, the overhead attributable to the renegotiable contracts in issue would be $164,010.10. The other method, advanced by Shull (used in the original statement to the Board), combines the fiscal years 1951 and 1952 and allocates overhead expenses for both years according to the total amount of renegotiable contracts completed during both years. Under this theory, the overhead allocation to the renegotiable contracts would be $161,494.30.

Both witnesses maintain that their respective methods more accurately reflect the overhead expenses attributable to the renegotiable contracts.

Thus, we have three allocation methods before us with the figures resulting from each method. Over the years accountants have developed numerous other methods which they have deemed acceptable. It is not within our province, under the circumstances, to determine which method results in the most accurate overhead expense allocation. The question of which method "should have been used by petitioner" is not before us. Petitioner "might have" used any of a number of methods. Petitioner, in fact, had adopted an acceptable method which it presumably deemed would result in a reasonably accurate

overhead allocation to the contracts in issue. It must continue to use such method for renegotiation purposes in the absence of circumstances not here present which would warrant a change. See sec. 103 (f), Renegotiation Act of 1951, *supra.*

Neither of petitioner's witnesses concerning this issue testified that the direct cost method failed to achieve a reasonably accurate allocation in any respect, but confined their testimony to advancing their respective theories. Petitioner's sole argument on this point is that in the fiscal year ended September 30, 1951, the officers of petitioner spent a large portion of their time on the Hanford project, and that the direct cost method did not reflect this fact.

Petitioner does not contend that the allocation of the officers' salaries between the two companies for that fiscal year was erroneous. Its argument is that a greater portion of the salaries which were, in fact, charged to petitioner for that year should have been allocated to the Hanford contracts.

The record discloses that of the time spent by the officers during the fiscal year ended September 30, 1951, on behalf of petitioner, the "bulk" or "considerable portion" of their time was spent on the Hanford contract. In the absence of any evidence as to a specific percentage of time each of the officers did work on the contract, but based on the entire record, we may assume that such contract commanded approximately 50 percent of the time spent on behalf of petitioner. A reasonable allocation, therefore, would have charged the Hanford contract with one-half of the salaries.

Petitioner appears to argue that inasmuch as only 32 percent of the general overhead expenses incurred that year was allocated to the Hanford contract, the officers' salaries were not allocated in the correct proportion. If all of the officers' salaries (which were charged to petitioner) were treated as general overhead, the fact that only 32 percent of the overhead was allocated to the contract in that year would tend to indicate a disproportionate allocation.

The record, however, shows that of the total officers' salaries charged to petitioner that year of $30,931,08, $10,247.52 was "charged to job costs" and not included in the general overhead account. The record does not disclose to which job or jobs such salaries were charged. In the absence of any evidence concerning this point, we may not speculate, but must assume that such amount was charged to the Hanford contract. Under this analysis, $10,247.52, in addition to 32 percent of the remainder of the salaries (treated as general overhead) or $6,618.74, totaling $16,866.26 was allocated to the Hanford contract. Inasmuch as the total salaries of the officers was $30,931.08, it appears that, in fact, over 50 percent of such salaries was charged to the Hanford contract.

548

In this connection, it should be noted also that approximately one-fourth of the total direct costs of the Hanford contract (upon which overhead was based) were costs of subcontracting. While the record indicates that some supervision was necessary over these subcontracts, such work would necessarily have been less of a burden on petitioner's general overhead than if such work had actually been performed by petitioner directly.

With the burden resting with petitioner, we face no duty of speculating further as to the reasonableness of the overhead allocation to the Hanford contract, but conclude that the reasonable overhead allocation to the renegotiable contracts before us is $126,101.38.

The parties agree that with this overhead allocation, the net profits on the renegotiable contracts would be $346,246.52.

The final issue before us is whether the profits agreed to of $346,246.52 were excessive, and, if so, to what extent.

The Renegotiation Act of 1951, as amended, in section 103(e),[2] specifies certain factors to be considered in determining what portion, if any, of the profits derived from Government contracts and subcontracts is excessive.

It is stipulated that petitioner's performance on the renegotiable contracts was of good quality, that petitioner was efficient in the use of materials, facilities, and manpower, and that the procuring and expediting of equipment and materials, particularly materials on the critical list, was difficult.

Respondent also agrees that petitioner should be given favorable consideration because of the character of its business. The project was of a highly specialized and technical nature requiring considerable engineering skill and experience differing from its normal contracts.

[2] Sec. 103(e). EXCESSIVE PROFITS.—The term "excessive profits" means the portion of the profits derived from contracts with the Departments and subcontracts which is determined in accordance with this title to be excessive. In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; and in addition, there shall be taken into consideration the following factors:

(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products;

(2) The net worth, with particular regard to the amount and source of public and private capital employed;

(3) Extent of risk assumed, including the risk incident to reasonable pricing policies;

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

(6) Such other factors the consideration of which the public interest and fair and equitable dealing may require, which factors shall be published in the regulations of the Board from time to time as adopted.

Respondent also agrees that petitioner should be given favorable consideration because of the substantial risks it assumed. Petitioner was placed in a position of building a project with materials and specifications unknown to it previously, with such project commanding a great amount of time and ingenuity of all of its officers. The extent of the risk involved may be seen also from the wide variance in the competitive bids. The second and third lowest bids for the contract were 106.3 percent and 130.7 percent of petitioner's bid.

In addition, because of the great amount of time needed on the Hanford contract, the efficiency on other contracts was sacrificed, thereby contributing to the causes of the losses sustained on them. Petitioner's total profit (before renegotiation) on all contracts for the fiscal year before us was only 6.4 percent.

For the fiscal years ending September 30, 1950 and 1951, petitioner realized a net profit on total contracts of 14.8 percent and 16.1 percent, respectively, or an average of 15.3 percent. Petitioner's renegotiable profits for the year in issue was 17.3 percent. Upon elimination of $50,000 excessive profits, such percentage would even be less than such average, or 15.2 percent.

Having taken these, and the other statutory factors into consideration, including, but not limited to the amount of private capital involved, the relationship of profits to net worth, the contribution to the defense effort, and the reasonableness of the profits realized, we have concluded and have found that petitioner realized excessive profits from renegotiable contracts during the fiscal year ended September 30, 1952, in the amount of $20,000.

*An order will be issued in accordance herewith.*