LTV Aerospace Corporation, Petitioner *v.* Renegotiation Board, Respondent

Docket Nos. 929–R, 963–R. Filed December 16, 1968.

*Jack Gray Johnson* and *James E. Coleman, Jr.*, for the petitioner.
*James H. Prentice*, for the respondent.

Simpson, *Judge:* The respondent, by unilateral orders dated August 16, 1955, and April 23, 1957, determined that Temco Aircraft Corp. (Temco), the predecessor in interest of the petitioner LTV Aerospace Corp., realized excessive profits of $750,000 in 1952 and $3,500,000 in 1953. Under section 108 of the Renegotiation Act of 1951,[1] the petitioner

---

[1] All statutory references are to the Renegotiation Act of 1951, except as otherwise indicated.

seeks *de novo* determinations of its excessive profits, if any. The petitions and answers thereto were timely filed. By amended answers, the respondent now claims excessive profits for 1952 in the amount of $2,300,000 and for 1953 in the amount of $5,250,000.

In determining the amount of profits subject to renegotiation, we must face two preliminary issues concerning amounts claimed by the petitioner as costs of Temco's renegotiable business in 1952 and 1953. These issues are: (1) Whether amounts expended by Temco in years prior to 1952 for research and development of the Buckaroo military training airplane are chargeable to costs of renegotiable business in 1952, the year in which Temco determined that the Buckaroo had no significant market potential; and (2) whether amounts contributed to an employees' qualified profit-sharing trust are allowable as costs of renegotiable business in 1952 and 1953 to the extent that such amounts are based on profits computed without any reduction resulting from renegotiation.

### Preliminary Issues

#### FINDINGS OF FACT

Many of the facts with respect to all issues in this case have been stipulated by the parties and those facts are so found.[2]

*Buckaroo Expenditures.*—During World War II, cadets in the U.S. Air Force were given their initial flying training in a relatively small aircraft with a low-horsepower engine; after this training, they were advanced to a heavier, more powerful, and more complex training aircraft, the AT-6. At the end of the war, the Air Force had a considerable number of AT-6 airplanes on hand, and it decided to give cadets their initial training as well in that aircraft, omitting the training in the smaller airplane. After 2 years' experience with the new training method, it was found that an excessively high percentage of trainees were failing to graduate from training despite the fact that more care was being exercised in selecting them than was normally taken during wartime. Observers of the training program believed it desirable that trainees receive their initial flight training in a smaller, less powerful aircraft, equipped, however, with some of the features and instrumentation of the AT-6 aircraft.

In early 1948, Temco knew these facts and knew also that the Air Force's supply of AT-6 aircraft was running low—production had been stopped at the end of the war. Seeing a need by the Air Force

---

[2] In addition to the principal stipulation filed by both parties, the petitioner and the respondent each submitted a supplemental stipulation containing facts which both parties agreed are true, but as to which the other party questioned the relevancy. We deem relevant all the facts so stipulated, for reasons which will appear in our opinion, and such facts are accordingly found as stipulated.

for a new training aircraft, Temco decided to try to convert a personal airplane built by it for private use, the GC1B Swift, into a tandem military trainer, subsequently designated the YT–35 Buckaroo Military Trainer. The U.S. Air Force evidenced interest in this project, which Temco named the Buckaroo project.

Between 1948 and 1952, Temco built several training-type airplanes based on the GC1B Swift, making changes and modifications in response to evolving Government specifications and changes made by Temco's competitors. During this period, the Air Force tested the Buckaroo and competing test models. In 1949, it awarded a contract for trainers to one of Temco's competitors, Fairchild, but Temco continued with the project in response to interest expressed by foreign governments. Later in 1949, the Fairchild contract was canceled and the Air Force ordered three airplanes from Temco, and three from each of two Temco competitors.

In 1950, the three Temco aircraft along with the three aircraft of one other company, the third having been eliminated from the competition, were delivered to the Air Force and were put to actual use in regular flight training work. During 1950 and 1951, Temco believed, on the basis of verbal communications with the Air Force, that it would receive a production order for the Buckaroo training plane, but no award was made to Temco or its competitors during that time. At the same time, Temco continued its attempts to interest foreign governments in the Buckaroo, and delivered one plane each to the Italian and Israeli Governments for evaluation. It believed that a production order from the Air Force would indicate a "stamp of approval" by the U.S. Government which would be of great aid in obtaining orders from foreign governments.

In 1952, Temco believed that Air Force enthusiasm for the Temco entry in the competition was on the wane and in the fall of that year it learned that the Air Force had placed an order for its competitor's entry, although it did not know what quantity had been ordered. Also in 1952, Temco received a production order for fighter aircraft from the U.S. Navy. Both these facts led the company to believe that an Air Force order for the Buckaroo was very unlikely.

In 1952, Temco began to build, and in 1953 it delivered, 10 Buckaroo trainers for the government of Saudi Arabia. In all, 25 Buckaroo airplanes were built in the project. Thirteen were sold for $11,000 each, one was donated to a college engineering department, and the others were used as a source of spare parts or were put in storage.

During the years 1948 to 1952, inclusive, Temco expended $531,299 on the Buckaroo as follows: 1948, $55,806; 1949, $126,902; 1950, $285,166; 1951, $51,071; 1952, $12,354. On its books and records, Temco capitalized such expenditures as "Deferred Development Costs"

which were accrued annually on a cumulative basis during 1948 to 1952, inclusive. At a special meeting of the board of directors held December 8, 1952, it was decided, in view of the improbability of an Air Force order for the Buckaroo, that there was no likelihood that the company would have sales volume sufficient to absorb the development costs incurred. Accordingly, the board voted to write off the costs in 1952, charging them as costs of renegotiable business against earnings for that year as follows:

| | |
|---|---:|
| Direct labor | $293, 364 |
| Direct materials | 45, 623 |
| Indirect mfg. expense | 130, 807 |
| Other costs | 61, 505 |
| Total | 531, 299 |

On its 1952 Federal income tax return, Temco claimed this $531,299 as a deduction, and the Internal Revenue Service, which audited the return, took no exception to this treatment of the development expenditures. Haskins & Sells, the accounting firm which audited Temco's accounts in the years 1948 through 1952, certified those accounts for those years in language similar to or identical with that used in the 1952 certificate:

In our opinion, except for any adjustments which might be required upon renegotiation and price redetermination * * *, the accompanying financial statements present fairly the financial position of the companies [Temco, its subsidiary, and affiliate] at December 31, 1951, and the results of their operations for the year then ended in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year.

At about the same time that the previously capitalized Buckaroo development expenses were written off, Temco made a change in its method of accounting for research and development costs, so as to charge them off as an expense in the year they were incurred whether or not such expenses were expected to result in a valuable asset for the company. This change in accounting method was approved by the Internal Revenue Service.

In 1952, Temco incurred research and development expenditures in the "Sunshine Project," a program to develop a side-by-side military trainer for the Air Force, whose interest had shifted from a tandem trainer. The expenditures, totaling $443,142, were charged as costs to renegotiable business in 1952. The Sunshine project was terminated in early 1953 when the Air Force designated one of Temco's competitor's as the successful entry in the side-by-side trainer competition. In 1953, Temco expended $812,289 on other research and development work, which it treated on its books as current costs in that year and charged to renegotiable business. Of this amount, $601,352 was expended for the Plebe project, a program to develop a primary trainer

for the Navy. In early 1954, Temco learned that another company had been awarded the Navy contract. Other research and development expenditures made in 1953 were for an experimental day fighter, $111,944, and another Air Force trainer, $58,415.

The following table shows Temco's accounting treatment of research and development expenses for the year 1946 through 1953:

TABLE I

DEFERRED DEVELOPMENT COSTS

| Year | Incurred in year | Balance carried forward Dec. 31 | Development expense charged to costs during year |
|---|---|---|---|
| 1946 | $18 | $18 | $1,114 |
| 1947 | | | 6,743 |
| 1948 | ¹ 55,806 | ¹ 55,806 | ² 143,949 |
| 1949 | ¹ 126,902 | ¹ 182,708 | |
| 1950 | ¹ 285,166 | ¹ 467,874 | 8,000 |
| 1951 | ¹ 51,071 | ¹ 518,945 | 16,092 |
| 1952 | ¹ 12,353 | | ³ 974,441 |
| 1953 | | | 812,289 |

¹ Buckaroo expenditures.
² Account captioned "Development Expenses—Loss on Swift Inventory."
³ Composed of $531,299 expended on Buckaroo and $443,142 expended on Sunshine project.

*Profit-Sharing Plan Contributions.*—On December 15, 1951, Temco and its subsidiary, Luscombe Airplane Corp., adopted a profit-sharing plan for its salaried employees. In 1952, this plan, which was a qualified plan under section 401 of the Internal Revenue Code of 1954, provided that the employer would make annual contributions to the plan in an amount equal to 12 percent of the participating employees' aggregate salaries, except that the amount of the contribution was limited (art. IV, sec. 4.1) to 10 percent of the "annual net profits" of the employer making the contributions. Annual net profit was defined as—

the amount of net profit earned by the Company [Temco] or other participating employer for its particular taxable year as calculated by the employer's chief accounting or fiscal officer after deducting from gross earnings for such year all costs, expenses and charges incurred and including a reserve for annual dividend of $0.20 per share of common stock issued and outstanding but before provision for Federal income or excess profits taxes and without deduction of the employer's contribution hereunder.

In 1953, the plan was amended to provide that the contribution would be 15 percent of the aggregate salaries paid by Temco alone, but with the same limitation of 10 percent of net profits. The plan, in both years, provided (art. IV, sec. 4.1) that the employer's contribution—

shall be paid to the [plan's] trust fund not later than the time prescribed by law for filing its Federal income tax return for such taxable year (including extensions thereof) and the employer's contribution for any year shall then be considered as having been made on the last day of its taxable year irrespective of when it is actually paid over to the trustee.

It further provided (art. IX, sec. 9.2) that the contributions once made were irrevocable, and no part of such contributions would ever revert to the company. The company reserved the right to amend, modify, or terminate the plan at any time, but it was provided (art. X, sec. 10.1(a)) that no such modification would result in or permit the return of "any property held or acquired by the trustee hereunder or the proceeds thereof."

For the calendar year 1952, Temco computed 10 percent of its unrenegotiated net profit to be $481,709, and 12 percent of the participating employees' aggregate salaries to be $367,577. Accordingly, Temco made a contribution to the profit-sharing plan in the amount of $367,577 and charged such sum as a cost to renegotiable contracts, there having been no profits on nonrenegotiable business for that year. For the calendar year 1953, Temco computed 15 percent of participating employees' salaries to be $720,101, and 10 percent of its unrenegotiated net profit to be $937,854. Accordingly, the smaller amount, $720,101, was contributed to the plan for the year 1953, and, there again being no profits on nonrenegotiable business for the year, it was charged in full as a cost of renegotiable business.

Temco's computation of the 10-percent profit limitation for the years at issue was based on net profits before renegotiation. On its books, Temco charged the contributions made for 1952 and 1953 as costs and deducted them on its Federal income tax returns for those years. Those returns were audited by the Internal Revenue Service which took no exception to Temco's including the $367,577 and $720,101 as deductions.

OPINION

Before facing the question of whether Temco realized excessive profits in 1952 and 1953 under the Renegotiation Act of 1951, we must determine the amount of profits arising from renegotiable business in those years and subject to renegotiation. The parties have stipulated the amounts of such profits with two exceptions, both of which involve the question whether certain expenditures made by Temco are properly chargeable as costs of renegotiable business.

The principles governing our decisions on these preliminary accounting issues are contained in section 103(f). That section provides in part:

The term "profits derived from contracts with the Departments and subcontracts" means the excess of the amount received or accrued under such contracts and subcontracts over the costs paid or incurred with respect thereto and determined to be allocable thereto. All items estimated to be allowed as deductions and exclusions under chapter 1 of the Internal Revenue Code (excluding taxes measured by income) shall, to the extent allocable to such contracts and subcontracts, be allowed as items of cost, except that no amount shall be allowed as

an item of cost by reason of the application of a carry-over or carry-back. * * * Costs shall be determined in accordance with the method of accounting regularly employed by the contractor or subcontractor in keeping his records, but, if no such method of accounting has been employed, or if the method so employed does not * * * in the opinion of The Tax Court of the United States, properly reflect such costs, such costs shall be determined in accordance with such method as * * * in the opinion of The Tax Court of the United States, does properly reflect such costs. * * *

*Buckaroo Expenses.*—The respondent contends that, under the applicable principles of law and good accounting practice, the Buckaroo development expenditures should have been expensed, rather than capitalized, in the year made, reducing profits for those years, and that they are not proper charges against 1952 renegotiable revenues. It would allow as a charge against 1952 income the $12,354 spent on Buckaroo in 1952, but would disallow the balance, $518,945, claimed by Temco.

Section 103(f) and the Renegotiation Board's regulations thereunder implicitly recognize that the proper treatment of a particular item of receipt or expenditure may differ, depending on the accounting method used to determine such treatment. The statute and the regulations provide that the method of accounting to be used in renegotiation proceedings shall be that "regularly employed by the contractor or subcontractor in keeping his records," unless the method so employed does not, in our opinion, "properly reflect" the costs in question. The fact that a contractor or subcontractor might have properly used another accounting method does not compel or permit us to apply that method to its receipt or expenditures if the method actually used is also proper. *Bay Co.* v. *Renegotiation Board*, 38 T.C. 535, 546–547 (1962).

There are two generally acceptable methods of accounting for research and development expenditures: Such expenditures may be capitalized and amortized over a definite period or a definite output of the product to which they relate, or they may be charged to operations when incurred. Hills, Law of Accounting and Financial Statements 243 (1957); cf. Grady, "Inventory of Generally Accepted Accounting Principles for Business Enterprises" 376, 377 (AICPA Accounting Research Study No. 7, 1965). See also 4A Mertens, Law of Federal Income Taxation, sec. 25.31, p. 147 (1966); sec. 174, I.R.C. 1954. However, the expert witnesses of both parties agreed that even under the capitalization method, where there is not a sufficiently close relationship between research and development expenditures and expected future revenues, such outlays should be expensed when made.

In the years 1948 through 1951, Temco used the method of accounting for research and development expenditures under which it capitalized those that were thought to be productive of future revenues and

expensed the others. Although in 1952 Temco changed its method of accounting for research and development expenditures, it is the former method which Temco "regularly employed" during the years 1948 through 1951 when it capitalized the expenditures in dispute. Clearly, such method is *a* proper one for accounting for research and development expenditures in the aircraft industry. The respondent successfully argued that such method was *the* proper one for the Boeing Co. to use in *Boeing Co.* v. *Renegotiation Board*, 37 T.C. 613 (1962), appeal dismissed 325 F. 2d 885 (C.A. 9, 1963), certiorari denied 377 U.S. 923 (1964).

In the present case, the main thrust of the respondent's argument is that the method employed by Temco in the years 1948 through 1951 was improperly applied to the facts. The parties are in agreement that under Temco's method of accounting, research and development expenditures should have been capitalized if, and only if, there was a reasonable certainty or expectancy at the time they were made that they were producing an asset which would generate sufficient future revenue to absorb such expenditures. The parties disagree over what degree of certainty must be present to justify capitalizing the expenditures and over what degree of certainty existed in this case. The respondent's expert accounting witness testified that capitalization would be improper unless there was a 75- or 80-percent certainty that a valuable asset would be created. The petitioner's witness, on the other hand, testified that the test is not that stringent—that "reasonable expectation" is all that is required.

We agree with the petitioner that the test is less stringent, as this Court has previously decided in *Boeing Co.* v. *Renegotiation Board*, *supra*. In 1952, Boeing undertook research and engineering on the development of a prototype jet-powered tanker which would be capable of fueling B-47 jet bombers at speeds and altitudes that would enable the Air Force to make full use of the B-47's capabilities, something not possible with existing, lower performance tankers. Although Boeing had previously employed a method of accounting which treated such expenditures as capital items, it sought and obtained permission from the Internal Revenue Service to change its method of accounting with respect to the prototype expenditures, so as to charge them to current expense instead of capitalizing them. Boeing argued that such expenditures were deductible from 1952 revenues in determining the amount of profits subject to renegotiation; the respondent argued that they should be capitalized. In response to Boeing's argument that in 1952 there was no reasonable certainty that the expenditure would lead to future income, we said:

> We are **not** impressed either with petitioner's contention that there was no certainty when the prototype's construction was begun in 1952 that it would ever be completed or that it would ever derive income as a result of its use or

that there was a market for the model of which it was a prototype. The word "certainty" as petitioner uses it has a broad philosophical connotation and, of course, in that sense there is considerable authority for the philosophical proposition that literally nothing is certain except death and taxes. *As used by this and other courts, however, in the context hereof the word means reasonably certain from a business standpoint, that is, an assurance based upon existing factors which lead in the normal course of business to an expected result. Hart-Bartlett-Sturtevant Grain Co.*, 12 T.C. 760. In view of its loss with respect to a prior prototype, we do not believe that petitioner would have so endangered its comparatively small net worth as to enter upon the construction of a multimillion dollar prototype airplane without a reasonable business assurance that the prototype would be completed and that there would be a reasonably assured and profitable future market for the models of which it was a prototype. We are convinced that *from a business standpoint petitioner took a calculated risk with respect to a future market but that such risk was no more than that which is to be expected in the ordinary conduct of any business.* * * * [Emphasis added. 37 T.C. at 620.]

Thus, under our reasoning in *Boeing*, research and development expenses may be capitalized under the method of accounting employed by Temco if, within the confines of ordinary business risk, they can be reasonably expected to result in future income.

Now, we turn to the factual question of whether Temco reasonably expected the research and development work on the Buckaroo to produce a profitable airplane. The respondent did not challenge Temco's treatment of the Buckaroo expenditures in the proceedings before the Renegotiation Board, but first raised its contention in its amended answer in this proceeding. Thus, under Rules 64(a) and 32 of this Court's Rules of Practice and our decision in *Nathan Cohen v. Secretary of War*, 7 T.C. 1002 (1946), the burden of proof is on the respondent to support its claim. *Aircraft Screw Products Co.*, 8 T.C. 1037, 1042 (1947).

During the years 1948 through 1951, Temco knew that the Air Force had a need for and was looking for a training aircraft, and it thought that its GC1B Swift private airplane could be modified to meet the Air Force's requirements. It did not have a contract to perform the research, and there was competition for the ultimate business. However, Temco did have an airplane that would fly, and although there were some setbacks, the Air Force continued to express interest in the Temco model throughout the years 1948–51. Moreover, Temco believed that if it obtained an Air Force order, it would have a good chance of getting orders from foreign governments.[3] In addition, it thought that its work on the Buckaroo for the Air Force might develop a trainer acceptable to the Navy. In each of the 4 years that

---

[3] Although there was a possibility that the research and development expenditures would yield future nonrenegotiable business, the respondent has not contended that, for this reason, some of the expenditures are allocable to nonrenegotiable business rather than to renegotiable business in 1952.

Temco capitalized the Buckaroo expenditures on its books, the firm which audited those books, Haskin & Sells, certified them as fairly stating the company's financial position in accordance with generally accepted accounting principles.[4]

On these facts, we are not convinced that we should reject the conclusion of Temco's management and its auditor and say that there was not, in each of the years Temco capitalized the Buckaroo expenses, a reasonable certainty of future profits from the Buckaroo, in the *Boeing* sense of the term. In 1952, Boeing undertook to build a prototype of a new and completely different type of aircraft, one which ultimately took more than 2 years to build and cost more than $18 million. Although Boeing had no competition and had good reason to believe that there would be a demand for a jet tanker, Boeing assumed other risks. It invested a large amount in the development of an airplane without knowing whether the plane would fly and without knowing whether it could be produced economically. In contrast, Temco's expenditures in 1948 through 1952 were made for the modification of an already existing and operable airplane. Though Temco knew it had competition, its risks and uncertainties appear to be no greater than those assumed by Boeing in the development of the jet tanker. Moreover, our willingness to rely upon the judgment of the Temco management is supported by our failure to find that their sound business judgment was colored by any motive such as tax savings.

The respondent relies on the fact that in 1952 and in several years thereafter Temco expensed research and development expenditures on training airplane projects similar to the Buckaroo project in the year incurred. However, we have found, on the basis of uncontradicted testimony of Temco's chief accountant in 1952 and 1953, that at the same time the decision was made to write off the Buckaroo expenditures, before the end of Temco's 1952 accounting year, it was decided to change the method of accounting for research and development expenditures—to expense them regardless of their likelihood of producing future income. Thus, evidence as to the subsequent treatment of research and development expenditures is not relevant to the propriety of the treatment of such expenditures in prior years.

Accordingly, the respondent has not carried his burden of showing that Temco improperly capitalized its Buckaroo expenditures in 1948 through 1951 under the method of accounting regularly employed by it in those years.

---

[4] The qualification in the certification, "except for any adjustments which might be required upon renegotiation and price redetermination," refers, we think, to the possibility that profits might be found to be excessive, and not to the propriety of accounting for particular expenditures.

The next question is whether Temco, having properly capitalized the Buckaroo expenditures in previous years, properly charged them off as costs of renegotiable business in 1952.[5] The respondent argues that even if the expenses were properly capitalized in prior years, they should not have been charged as a cost of renegotiable business in 1952. It says that they constituted a nonrecurring, nonoperating item of adjustment to surplus in 1952 and should have been treated either as a direct charge to retained earnings on the balance sheet or have been shown on the income statement below the amount identified as 1952 income, as a correction to the income shown on prior years' profit and loss statements. Such costs were not, the respondent says, costs paid or incurred with respect to 1952 renegotiable business within the meaning of section 103 (f).

The respondent's suggested treatment of the expenses may have been the proper one for reporting Temco's financial condition to its stockholders and creditors. However, it is not a proper method for determining Temco's 1952 costs under the Renegotiation Act. The respondent's contention is contrary to its own published regulations which provide in pertinent part as follows:

Sec. 1459.8   Other costs, expenses and reserves.

(e) *Research and development expenses.*—(1) Research and development expenses allowable as costs under the Internal Revenue Code for the year under review will be allocated to renegotiable business to the extent that such expenses are required for, or incidental to the performance of, any renegotiable contract.

(2) Other research and development expenses, likewise allowable in the year under review as costs under the Internal Revenue Code, may be allocated to renegotiable business under certain conditions, as follows:

\*       \*       \*       \*       \*       \*       \*

(ii) if the expense was incurred in developing processes or products as a preparation to enable the contractor to bid or negotiate for future defense business, or to perform such business more efficiently.

\*       \*       \*       \*       \*       \*       \*

(5) In some cases, a contractor may capitalize expenditures on research and development, pursuant to its method of accounting employed for tax purposes. Such expenditures are then of course not allowable as costs in renegotiation. However, at times there may be deductions allowed for Federal tax purposes, when such expenditures are later charged off in whole or in part. The allocation of such deductions to renegotiable business will be governed by the principles set forth above with respect to allocation of costs.

The regulations demonstrate two points relevant to the issues facing us. First, they establish that research and development costs need not

---

[5] In view of the continuing work on the airplanes for Saudi Arabia, one may wonder whether the Buckaroo project was abandoned in 1952. However, the respondent has not questioned 1952 as the year in which, if the Buckaroo expenditures were properly capitalized in prior years, they should be charged off.

benefit or relate to renegotiable business in the current year to be allowable as costs in the current year. Indeed, the respondent seems to concede this point by not disputing that the $12,353 expenditure on Buckaroo made for research and development in 1952 is deductible in that year despite the lack of any showing that such expenditure benefited renegotiable business for that year. The second point made by the regulations is that research and development expenditures previously properly capitalized may be charged as costs of renegotiable business, if allocable thereto, in the year they are proper charges against income for Federal tax purposes. It is not disputed that the capitalized expenditures were allocable to renegotiable business within the meaning of section 1459.8(e)(5) of the regulations. Clearly, they were incurred to aid Temco to bid for future defense business within the meaning of section 1459.8(e)(2)(ii). Thus, the only question is whether they were a proper charge against income for tax purposes in 1952. The Internal Revenue Service on its audit of Temco's 1952 income tax return did not dispute the 1952 deduction of the Buckaroo expenses. It is clear that the charge off in 1952 was a proper income tax deduction in that year. See, e.g., *Hart-Bartlett-Sturtevant Grain Co.*, 12 T.C. 760 (1949), affd. 182 F. 2d 153 (C.A. 8, 1950); *Acme Products Co.*, 24 B.T.A. 194 (1931).

Since the Buckaroo expenses are properly allocable to renegotiable business, they should be allowed as a cost of renegotiable business in some year. If Temco had charged off each year the expenditures on the Buckaroo project, they would have been allowable as costs of renegotiable business for such years. Temco should not be denied the right to charge them off against renegotiable business in a later year merely because they properly elected to capitalize the expenditures in the earlier years. Yet, the effect of the position urged by the respondent is to deny Temco the opportunity to charge the Buckaroo expenses against any renegotiable business. To adopt that position would be inconsistent with the purposes of the Renegotiation Act.

In summary, Temco's treatment of the Buckaroo expenditures was proper and it is entitled to a charge against 1952 renegotiable business of $531,299 on their account.

*Profit-Sharing Plan Contributions.*—The next preliminary issue concerns the allowability of the contributions made by Temco to its employees' profit-sharing plan in 1952 and 1953 as costs of renegotiable business. The respondent contends that in determining the allowable contributions under the profit-sharing plan, the limitation should be applied to the profits of Temco after giving effect to renegotiation, thus resulting in a reduction in the contributions under the plan which are allowable as costs of renegotiable business. We do not agree.

The amounts Temco contributed to its profit-sharing plan are allowable as costs in renegotiable business if they are allowable as deductions for purposes of the Federal income tax. Sec. 1459.2(d),[6] R. B. Regs. The respondent's principal argument is that some of the contributions must be disallowed as costs because they were not made in in conformity with the formula determining contributions under the plan. However, the tax law contains no requirement that contributions to a profit-sharing plan be made according to a definite formula. Rev. Proc. 56–22, 1956–2 C.B. 1380. Although the Treasury's regulations under the 1939 Code originally contained such a requirement, the regulations promulgated under the 1954 Code do not, and the 1939 regulations were retroactively amended to bring them into conformity. T.D. 6189, 1956–2 C.B. 972. This change in the regulations was made in response to court decisions which held invalid the requirement of a definite formula for determining the profits to be shared. Even if a qualified profit-sharing plan does contain such a formula, an employer is entitled to a deduction for contributions in excess of amounts determined thereunder, subject, of course, to the statutory limitations. Rev. Rul. 56–366, 1956–2 C.B. 976. In view of the change in the regulations and in the position of the Internal Revenue Service, *McClintock-Trunkey Co.*, 19 T.C. 297 (1952), revd. 217 F. 2d 329 (C.A. 9, 1954), in which this Court held that contributions were restricted to the formula, is not applicable. Thus, under the internal revenue law, the deductibility of the contributions by Temco depends merely upon whether the statutory tests are satisfied, and the meaning of the contribution formula in the plan is irrelevant.

Even if the income tax deduction were limited to contributions made pursuant to the formula, we are far from convinced that Temco failed to adhere to its formula. The question is whether "net profits" *as used in the plan* refers to profits before or after renegotiation. *Wooster Rubber Co.* v. *Commissioner*, 189 F. 2d 878 (C.A. 6, 1951), reversing on another ground 14 T.C. 1192 (1950). The plan provided that contributions were to be made not later than the time Temco's Federal income tax return was to be filed, i.e., March 15 of the following year, and that contributions once made to the plan were irrevocable. Yet under section 105 (c) and (e), as much time as 17 months after the close of a contractor's fiscal year may elapse before the Renegotiation Board need even begin proceedings to determine whether the

---

[6] Sec. 1459.2 Salaries, wages and other compensation.

(d) *Pension, annuity, stock bonus and profit sharing plans.*—Payments on account of plans for pensions, annuities, stock bonuses, or profit sharing, estimated to be deductible under the Internal Revenue Code, will be allowed as items of cost of renegotiable business to the extent allocable thereto under the principles set forth in section 1459.1(b). * * *

Temco allocated the entire amount of its contributions to the plan to renegotiable business, apparently because it earned no profit on its nonrenegotiable business in 1952 or 1953, and the respondent has not questioned this allocation.

contractor received excessive profits. It thus seems clear that Temco's plan must have contemplated that the profit limitation be computed on the basis of profits before renegotiation, since profits as reduced by renegotiation would, in all likelihood, not be known by the time the contribution was made.

The respondent relies on *Larrabee* v. *Stimson*, 17 T.C. 69 (1951), and *Ring Construction Corporation* v. *Secretary of War*, 8 T.C. 1070 (1947), affd. 178 F. 2d 714 (C.A.D.C. 1949), certiorari denied 339 U.S. 943 (1950), to support his position, but those cases are distinguishable.

In *Ring*, the contractor-petitioner employed two men, Wiik and Floyd, under a profit-sharing contract. The contract provided that Wiik was entitled as compensation to 10 percent of 40 percent, and Floyd to 10 percent of 60 percent, of the profits arising from contracts subject to renegotiation. The petitioner claimed as salary expense chargeable to renegotiable business amounts computed by applying such percentages to profits before renegotiation—approximately $213,000 as salary expense. In a suit by Floyd against Ring, another court had construed the contract to mean that the salaries were to be based on profits after reduction through renegotiation. *Floyd* v. *Ring Const. Corporation*, 66 F. Supp. 436 (D. Minn. 1946). We accordingly held that the petitioner was entitled to charge as a cost of renegotiable business only the amount it owed Wiik and Floyd under the contract, $60,000.

In *Larrabee*, a similar problem was presented. We again construed the agreement between the contractor and its employee to mean that payments to the employee would be based on profits after reduction by renegotiation and accordingly limited the charge against renegotiable business to the amount so payable.

In *Ring* and *Larrabee*, the contractor's charge against renegotiable business was restricted to a percentage of profits after renegotiation because that was all that was required to be paid under the contracts; whereas, in the present case, Temco was not limited to a contribution based on profits after renegotiation. In fact, as we have previously indicated, its plan apparently contemplated that the contributions would be based upon profits before renegotiation. In addition, although Temco, prior to making its contribution for a particular year, had considerable latitude in determining the amount thereof, its contributions, once made, were irrevocable. Thus, allowing Temco to charge its contributions is not inconsistent with the *Ring* and *Larrabee* decisions.

We hold that the amounts contributed by Temco in 1952 and 1953 were allowable income tax deductions in those years and are therefore allowable in this proceeding as costs of renegotiable business in those years.

Our rulings on these preliminary issues will be reflected in our principal findings of fact, except as otherwise noted.

*Determination of Excessive Profits*

FINDINGS OF FACT

The petitioner, LTV Aerospace Corp., is a subsidiary of Ling-Temco Vought, Inc., of Dallas, Tex. Subsequent to the filing of petitions in this Court by Temco and following a series of corporate mergers, LTV Aerospace Corp. assumed the renegotiation liabilities, if any, of Temco for Temco's fiscal years ended December 31, 1952, and December 31, 1953, and acquired the right to any refund of an asserted renegotiation liability heretofore paid by Temco.

Temco was a Delaware corporation originally incorporated, in 1946, under the name of Texas Engineering & Manufacturing Co., Inc. The name was changed to Temco Aircraft Corp. in 1952.

From April 29, 1946, the date of its incorporation, to January 1, 1956, Temco's fiscal year was the calendar year. During such period, Temco kept its books according to the accrual method of accounting.

During World War II, North American Aviation, Inc., occupied two large adjacent manufacturing plants in Dallas, Tex., which were built by the U.S. Government in 1940 to 1943. After producing approximately 24,000 military aircraft during the war, North American, on V-J Day, 1945, closed down its Dallas plants and laid off approximately 25,000 workers. Mr. Robert McCulloch was in charge of production at North American's plants until 1945, and at the end of the war, he was spending most of his time at the Dallas plants, where he had become division manager.

Aware of the pool of trained labor made available by the plant closing and of the possibility of leasing from the Government all or a part of the plant formerly occupied by North American, Mr. McCulloch conceived the idea of forming a new engineering and manufacturing corporation, making use of such labor. He formed Temco, whose original aim was to build aircraft components, popcorn machines, tractors, truck bodies, and other items of a sheet metal nature. The aircraft construction industry was at low ebb in 1946, and Temco thus did not then contemplate building airplanes.

Mr. McCulloch and his associates, including people who were familiar with the North American workers, carefully selected their employees from that group in order to get the best employees possible for the new company. As Temco expanded, new employees were hired, for the most part from the same pool of employees. As a result of the fact that Temco provided jobs, of the selectivity exercised in selecting the employees, and of the employees' confidence in the management,

the morale of the employees and their enthusiasm in the new enterprise was high, and remained high through 1953. Temco suffered no work stoppages or slowdowns in either 1952 or 1953. The following schedule shows the total number of employees as of December 31 of each year, 1947 through 1953:

TABLE II

| Year | Employees on Dec. 31 | Year | Employees on Dec. 31 |
|------|------|------|------|
| 1947 | 600 | 1951 | 6, 091 |
| 1948 | 2, 506 | 1952 | 6, 748 |
| 1949 | 1, 092 | 1953 | 5, 658 |
| 1950 | 3, 419 | | |

During the years 1946 through 1953, Temco's primary operations were conducted in all or a portion of one of two plants in Dallas formerly occupied by North American Aviation. Originally, Temco operated under a lease with the Department of the Navy, which had taken over the premises after North American left. Temco leased 500,000 square feet of the plant and had the right to sublet portions of the plant and use the revenue therefrom to maintain the building and premises. In 1949, this lease was canceled, and the Navy leased the plant to Chance Vought Aircraft Division of the United Aircraft Corp. Temco, in turn, sublet its portion of the plant from Chance Vought. Under Chance Vought's prime lease, the Navy had the right to terminate that lease on short notice. Temco's sublease provided that in such event the sublease would be terminated. In addition, the sublease provided that either party could cancel it at the end of any year and that Chance Vought could terminate the lease on written notice from the Navy that the plant was needed for the performance of Navy contracts. This sublease was not terminated in 1952 or 1953. In 1952 and 1953, Temco occupied, exclusively, all of one of the two plants covered by Chance Vought's prime lease. Such premises were constructed by the United States from 1940 to 1943 at an original cost of $4,366,077.61—$3,913,332.61 for the buildings, containing 1,051,726 square feet, and $452,745 for the parking area. In 1952 and 1953, Temco also used in common with Chance Vought certain passageways and outside parking areas, and certain utility systems and related installations which served both the space occupied by Temco and that occupied by Chance Vought (which exceeded the space occupied by Temco). The original cost of such jointly used facilities, which were constructed by the Government from 1941 to 1943, was $3,389,591.46.

Temco, in addition to expanding its occupancy of the Dallas plant prior to 1952, acquired the use of other property. Prior to 1951, Temco acquired a controlling interest in Luscombe Airplane Corp. (Luscombe), a company whose plant and facilities were located at Garland,

Tex., in Dallas County. On March 31, 1953, Luscombe was merged into and became a part of Temco. The following schedule shows the premises occupied by Temco in 1952 and 1953, including the Dallas (Grand Prairie) plant leased from Chance Vought and the rental paid for such occupancy:

TABLE III

| Lessor and (facility) | Location | Space occupied on Dec. 31 (square feet) | Rent paid |
|---|---|---|---|
| *1952* | | | |
| Chance Vought (USN Industrial Reserve Aircraft Plant (NIRAP)). | Grand Prairie, Tex | 1,053,726 | $575,491 |
| City of Greenville (Majors Field) | Greenville, Tex | 176,861 | 40,060 |
| Alto B. Cervin (Cervin Warehouse) | Grand Prairie, Tex | 10,000 | 4,200 |
| Totals 12/31/52 | | 1,238,587 | 619,751 |
| *1953* | | | |
| Chance Vought (USN IRAP) | Grand Prairie, Tex | 1,051,726 | 631,036 |
| City of Greenville (Majors Field) | Greenville, Tex | 207,051 | 47,607 |
| Alto B. Cervin (Cervin Warehouse) | Grand Prairie, Tex | 10,000 | 4,325 |
| J. A. Burnett (Ferguson Warehouse) | Grand Prairie, Tex | 16,150 | 7,800 |
| McFadden & Miller (Glenfield Warehouse) | Grand Prairie, Tex | 45,000 | 24,750 |
| Mrs. Mary Nevins (Nevins Warehouse) | Garland, Tex | 2,500 | 960 |
| Total rented | | 1,332,427 | 716,478 |
| Temco owned (Luscombe Plant) | Garland, Tex | 206,418 | |
| Totals 12/31/53 | | 1,538,845 | 716,478 |

These lease rentals were charged to overhead costs, and were allocated $613,553 to renegotiable business and $6,198 to nonrenegotiable business in 1952, and $695,700 to renegotiable business and $20,778 to nonrenegotiable business in 1953.

*General Business Data.*—When Temco first began operations, neither Government work nor aircraft work was a significant part of its operations. During the early period, in addition to building vending machines and other nondefense sheet metal items, Temco did have a few contracts for building aircraft and aircraft subassemblies. Between 1946 and 1951, Temco bought out two aircraft companies in bankruptcy, the Globe Aircraft Corp. and Luscombe, acquisitions which served to increase Temco's involvement in the aircraft industry. In 1948, the Berlin Airlift brought Temco strongly into Government aircraft work, primarily overhaul work. Prior to 1951, the work done by Temco for the United States consisted almost entirely of overhaul and modification work on military aircraft. Approximately 80 percent of this work was done under cost-plus-a-fixed-fee (CPFF) contracts. By such work, Temco established itself in the aircraft industry, so that with the outbreak of the Korean war in 1950 and the resulting increase in production of military aircraft, Temco began to do an increasing amount of subcontract work on

military aircraft, building various components for various prime contractors.

Temco's operations for the period prior to 1952 are summarized in the following table:

TABLE IV

| | 1947 | 1948 | [2] 1949 | 1950 | [2] 1951 |
|---|---|---|---|---|---|
| Renegotiable sales: | | | | | |
| CPFF contracts | $4,518,241 | $8,652,903 | $5,343,602 | $15,498,670 |
| All other contracts | | | 506,593 | 3,601,114 | 17,223,852 |
| Total renegotiable sales | | 4,518,241 | 9,159,496 | 8,944,716 | 32,722,522 |
| Cost of renegotiable sales | | 4,358,750 | 8,604,785 | 8,556,987 | 31,046,075 |
| Pretax profit on renegotiable sales | | 159,491 | 554,711 | 387,729 | 1,676,447 |
| Nonrenegotiable sales | $5,895,255 | 5,508,430 | 3,473,046 | 3,770,006 | 642,225 |
| Cost of nonrenegotiable sales | 5,295,974 | 4,215,895 | 2,708,051 | 3,293,376 | 578,096 |
| Pretax profit on nonrenegotiable sales | 599,281 | 1,292,535 | 764,995 | 476,630 | 64,129 |
| Reconciling items: | | | | | |
| Additional costs [1] | | 31,185 | (215) | 3,684 | 7,850 |
| Total net profit before taxes on income | 599,281 | 1,420,841 | 1,319,921 | 860,675 | 1,732,726 |
| Taxes on income | 228,623 | 549,589 | 498,745 | 359,966 | 906,672 |
| Aftertax profit | 370,658 | 871,252 | 821,176 | 500,709 | 826,054 |
| Dividends paid | | 144,915 | 179,152 | 179,152 | 179,152 |
| Retained earnings | 370,658 | 726,337 | 642,024 | 321,557 | 646,902 |

[1] Reconciling items are additional costs not allowed as deductions or expenses by IRS, such as life insurance premiums on executives.
[2] Renegotiation refund for the year 1949 which was actually paid in 1951 has been eliminated from renegotiable sales and profits for 1949 and from any effect on 1951.

In 1952 and 1953, the vast bulk of Temco's business was derived from subcontracts subject to renegotiation. Its operations primarily involved multiple manufacturing, fabricating, engineering, and assembly functions with respect to aircraft. Its renegotiable business was performed under several types of contract or subcontract. Under CPFF contracts, the seller received reimbursement for its actual cost plus a negotiated fee as profit.

Fixed-price-redeterminable (FPR) contracts provided for a billing price and then provided for a redetermination of that price in a pricing negotiation based on a.review of the costs incurred after the production of a certain number of units under the contract. The usual point of redetermination was after production of 20 to 30 percent of the units to be produced under the contract. The redetermined unit price was applied retrospectively and prospectively to all units under the contract. The determination, submission, and auditing of costs and the pricing negotiation at the redetermination point required additional time, so that additional units were produced between the cost determination point and the actual completion of price negotiations.

Under fixed-price contracts, the price was fixed before any deliveries were made under the contract and remained unchanged.

These include some contracts under which some costs had been incurred prior to the fixing of the price.

Under incentive contracts, the parties negotiated an initial target price which included a profit based on estimated costs. After delivery of a specified number of units, the parties negotiated a firm target price composed of (1) actual costs, (2) estimated costs to complete, and (3) profit at a percentage of total estimated target costs (actual costs plus estimated costs). Upon completion, actual costs and final contract price were determined. If the actual costs were less than the total estimated target costs, the final contract price was composed of (1) actual costs, and (2) the agreed profit at the agreed percentage of total estimated target costs plus 5 percent of the difference between the total estimated target costs and actual costs. If the actual costs were greater than the total estimated target costs, the final contract price was composed of (1) actual costs (but not in excess of 125 percent of the total estimated target costs), and (2) the agreed profit at the agreed percentage of total estimated target costs less 5 percent of the difference between the total estimated target costs and actual costs.

Under no-fee facilities contracts, the contractor was reimbursed for its actual cost but was allowed no profit.

Under terminated contracts, the contractor was reimbursed for its reimbursable costs under contracts terminated by the customer, plus a negotiated profit.

The following income statements show the composition of Temco's business in 1952 and 1953:

TABLE V

| | 1952 | 1953 |
|---|---:|---:|
| Renegotiable sales by type of contract: | | |
| CPFF | $9,474,761 | $7,551,886 |
| FPR | 26,640,878 | 36,433,071 |
| Fixed price | 5,749,468 | 6,686,375 |
| Incentive | 5,554,677 | 714,959 |
| Facilities | 2,244,852 | 3,036,804 |
| Terminated | | 15,337,242 |
| | $49,664,636 | $69,760,337 |
| Total cost and expenses allocable to renegotiable sales:[1] | | |
| Material | 14,434,505 | 20,560,097 |
| Direct labor | 13,213,243 | 14,092,278 |
| Manufacturing burden | 14,574,026 | 18,061,031 |
| Other direct costs | 1,097,219 | 5,934,061 |
| Total cost of renegotiable sales | 43,318,993 | 58,647,467 |
| Selling and advertising expense | 49,061 | 77,512 |
| General and administrative expense | 681,512 | 948,403 |
| Profit-sharing trust expense | 367,577 | 720,101 |
| Other net expense | 417,366 | 224,459 |
| Total other expense | 1,515,516 | 1,970,475 |
| | 44,834,509 | 60,617,942 |
| Net profit on renegotiable sales | 4,830,127 | 9,142,395 |
| Net profit (loss) on nonrenegotiable sales: | (165,828) | (95,683) |
| Nonnegotiable sales | 776,192 | 1,613,428 |
| Total costs for nonrenegotiable sales | 942,020 | 1,709,111 |
| Total net profit before tax | 4,664,299 | 9,046,712 |
| Taxes on income | 3,315,000 | 6,423,841 |
| Aftertax profit | 1,349,299 | 2,622,871 |
| Dividends paid | 313,516 | 698,766 |
| Retained earnings | 1,035,783 | 1,924,105 |

[1] Such costs reflect our decisions on the preliminary accounting issues.

Table VI shows the cost and profit figures for sales under each type of renegotiable contract, except that such table does not reflect our decision that the Buckaroo expenditures and profit-sharing plan contributions are allowable costs of renegotiable business:

TABLE VI

*1952*

| | Sales | Percent of total sales | Costs | Profits |
|---|---|---|---|---|
| CPFF | $9, 474, 761 | 19. 6 | $8, 973, 528 | $501, 233 |
| FPR | 26, 640, 878 | 53. 6 | 22, 784, 629 | 3, 856, 249 |
| Fixed price | 5, 749, 467 | 11. 6 | 4, 744, 063 | 1, 005, 404 |
| Incentive | 5, 554, 678 | 11. 2 | 5, 200, 916 | 353, 762 |
| Facilities | 2, 244, 852 | 4. 5 | 2, 244, 852 | |
| Terminated | | | | |
| | 49, 664, 636 | | [1] 43, 947, 988 | [1] 5, 716, 648 |

*1953*

| | Sales | Percent of total sales | Costs | Profits |
|---|---|---|---|---|
| CPFF | $7, 551, 886 | 10. 8 | $7, 263, 415 | $288, 471 |
| FPR | 36, 433, 071 | 52. 2 | 27, 588, 409 | 8, 844, 662 |
| Fixed price | 6, 686, 375 | 9. 6 | 6, 420, 932 | 265, 443 |
| Incentive | 714, 959 | 1. 0 | 673, 605 | 41, 354 |
| Facilities | 3, 036, 804 | 4. 4 | 3, 036, 804 | |
| Terminated | 15, 337, 242 | 22. 0 | 14, 914, 676 | 422, 566 |
| | 69, 760, 337 | | [1] 59, 897, 841 | [1] 9, 862, 496 |

[1] The total profit on renegotiable business as shown here is higher than that shown on Table V, and the total costs as shown here are lower, in 1952, by an amount equal to the contributions made to the profit-sharing plan plus the amount of previously incurred Buckaroo expenditures written off in that year, and, in 1953, by the amount of the profit-sharing plan contributions for that year, which amounts we have found to be allowable costs of renegotiable business.

Temco's renegotiable sales for 1952 and 1953 were attributable to its various renegotiable contracts and subcontracts as follows:

TABLE VII

| | 1952 | 1953 |
|---|---|---|
| Manufacture of fuselage sections for Boeing B-47 Bomber, under subcontract with Boeing Airplane Co | $17, 299, 868 | $15, 261, 155 |
| Manufacture of fuselage sections for Boeing RB-47 Bomber, under subcontract with Boeing Airplane Co | 84, 322 | 4, 487, 629 |
| Manufacture of wings for Lockheed P2V5 Patrol Bomber, under subcontract with Lockheed Aircraft Corp | 8, 596, 623 | 11, 304, 384 |
| Manufacture of wings for Lockheed P2V6 Patrol Bomber, under subcontract with Lockheed Aircraft Corp | 2, 633, 684 | 4, 297, 115 |
| Manufacture of center section for Douglas A2D Attack Fighter, under subcontract with Douglas Aircraft Co | 5, 554, 677 | 723, 563 |
| Manufacture of bomb bay doors for the Martin P5M-1 Patrol Bomber, under subcontract with The Martin Co | 761, 312 | 1, 792, 943 |
| Manufacture of elevators, doors, rudders for Convair B-36 Bomber, under subcontract with Consolidated-Vultee Aircraft Corp | 10, 824 | 2, 031, 579 |
| Terminated contracts for manufacture of center section of Douglas A2D Attack Fighter, under subcontract with Douglas Aircraft Co | 0 | 5, 898, 295 |
| Terminated contract for manufacture of complete McDonnell F3H Fighter Plane, under contract with U.S. Navy | 0 | 9, 238, 259 |

|  | 1952 | 1953 |
|---|---|---|
| CPFF contracts with U.S. Air Force for overhaul of C-54 aircraft | $4, 895, 747 | $3, 109, 188 |
| CPFF contracts with U.S. Air Force for overhaul of F-47 aircraft | 4, 555, 187 | 3, 548, 218 |
| Other CPFF Government contracts | 23, 827 | 894, 480 |
| All other contracts and subcontracts | 5, 248, 555 | 7, 173, 529 |
| Total | 49, 664, 636 | 69, 760, 337 |

*Boeing and Lockheed Contracts.*—As shown in Table VII, a substantial portion of Temco's revenue in 1952 and 1953 was derived from subcontracts with Boeing Airplane Co. and Lockheed Aircraft Corp. Under subcontracts with Boeing, Temco constructed the aft fuselage section for Boeing's B-47 jet bomber, and a similar aft fuselage section for Boeing's RB-47 reconnaissance jet bomber. Under subcontracts with Lockheed, Temco constructed outer wings for Lockheed's Navy P2V5 aircraft and for its Navy P2V6 aircraft. The original contracts for each item were typical FPR contracts. Under later contracts the price was determined on the basis of Temco's cost experience under the prior contracts for the same item.[7] Table VIII summarizes the terms of the various subcontracts and the prices redetermined thereunder:

TABLE VIII

| Purchase order (Temco designation)(number of units to be delivered) | Date contract executed | Units to be completed under contract before redetermination | Date of redetermination | Units delivered at date of redetermination | Redetermined price per unit | Total contract price |
|---|---|---|---|---|---|---|
| Boeing B-47 fuselage sections: | | | | | | |
| 1st (TE-54)(576) | 1950 | 139 | July 29, 1952 | 317 | [1] $59, 507 | [1] $34, 276, 187 |
| 2d (TE-54)(227) | 1952 | [2] 0 | July 24, 1953 | 10 | 49, 078 | 11, 140, 706 |
| 3d [3] (247) | 1953 | | | | | |
| Boeing RB-47 fuselage sections: | | | | | | |
| 1st (TE-73)(52) | 1951 | 7 | July 24, 1953 | 21 | 63, 911 | 3, 323, 372 |
| 2d (TE-73)(168) | 1952 | 0 | July 24, 1953 | 0 | 59, 554 | 10, 005, 072 |
| 3d [3] (35) | 1954 | | | | | |
| Lockheed P2V5 wing sets: | | | | | | |
| 1st [4] (TE-55)(5 sets) | 1950 | 58 | Aug. 29, 1952 | 82 | 68, 720 | 15, 668, 149 |
| 2d (TE-61)(223 sets) | 1952 | | | | | |
| 3d (TE-62)(156 sets) | 1952 | [5] 0 | June 11, 1953 | 0 | 51, 512 | 8, 035, 923 |
| Lockheed P2V6 wings: | | | | | | |
| 1st (TE-59)(60) | 1952 | 21 | Nov. 21, 1952 | 33 | 71, 327 | 4, 279, 645 |
| 2d (TE-63)(23) | 1952 | 0 | Nov. 21, 1952 | 0 | 62, 389 | 1, 434, 949 |

[1] Under a letter dated Feb. 20, 1953, Temco made a voluntary refund with regard to this contract of $1,400,000, or approximately $2,431 per unit.
[2] 498 completed under previous contracts.
[3] Information not available.
[4] The first and second Lockheed P2V5 contracts were treated as one for purposes of negotiation and redetermination.
[5] 139 completed under previous contract.

---

[7] Such contracts do not fit within the literal definition of FPR contracts, insofar as they made no provision for production under the particular contract prior to price redetermination. Nevertheless, prices under such contracts were in fact fixed in redetermination-like proceedings, on the basis of experience under prior contracts for the same items, and were not finally fixed until after deliveries had been made under the contracts. The parties to this proceeding have dealt with these later contracts as FPR contracts, and so do we, although we remain aware of this distinction between the earlier and the later contracts.

Table IX shows the years in which deliveries were made under the various subcontracts.

TABLE IX

| Purchase order | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 |
|---|---|---|---|---|---|---|
| Boeing B-47 fuselage: | | | | | | |
| 1st (TE-54) (576 units) | 138 | 295 | 143 | | | |
| 2d (TE-54) (227 units) | | | 85 | 142 | | |
| 3d (247 units) | | | | 43 | 119 | 85 |
| Boeing RB-47 fuselage: | | | | | | |
| 1st (TE-73) (52 units) | | 1 | 51 | | | |
| 2d (TE-73) (168 units) | | | 14 | 142 | 12 | |
| 3d (35 units) | | | | | 35 | |
| Total | 138 | 296 | 293 | 327 | 166 | 85 |
| Lockheed P2V5 wing sets: | | | | | | |
| 1st (TE-55) (5 sets) } 2d (TE-61) (223 sets) | 25½ | 101½ | 101 | | | |
| 3d (TE-62) (156 sets) | | | 54 | 102 | | |
| Lockheed P2V6 wing sets: | | | | | | |
| 1st (TE-59) (60 sets) | | 35 | 25 | | | |
| 2d (TE-63) (23 sets) | | | 23 | | | |
| Total | 25½ | 136½ | 203 | 102 | 0 | 0 |

At the sessions where price redeterminations on these contracts were negotiated, Temco submitted extensive data showing its cost experience on previous production. This data was either audited by the prime contractor or by Government auditors in Temco's plant. On the basis of the actual costs of production prior to redetermination, Temco prepared estimates of costs for the remainder of the contract. The computation of total costs depended in great measure on direct labor costs; for example, indirect labor and overhead charges were estimated on the basis of a percentage of direct labor costs. Thus, the projection of direct labor costs was an important element in estimating total contract costs.

Temco's estimates of future direct labor costs were developed through the use of a device widely used in the aircraft industry, a learning curve, sometimes called an efficiency or improvement curve. The learning curve is a mathematical or graphic description of the proposition that each time production is doubled, direct costs are reduced at a constant rate. This rate of reduction is termed the "slope" of the learning curve. Temco's cost projections submitted in connection with redetermination negotiations were based on the following learning-curve slopes: First Boeing B-47 contract (576 units), 86 percent; second Boeing B-47 contract (227 units), 85 percent; first (52 units) and second (168 units) Boeing RB-47 contracts, 85 percent; and first (5 sets) and second (223 sets) Lockheed P2V5 wing set contracts, 83 percent. Temco manufactured the fuselage section for the Boeing B-47 and the RB-47 simultaneously and employed its cost experience under one contract to aid in determining its estimated costs on the other. Similarly, the wing sets for Lockheed's P2V5 and P2V6 airplanes were manufactured simultaneously, and similar use was made with respect to the cost experience.

Temco's contracts with Lockheed provided that the redetermined

prices would include a profit of not more than 10 percent of target costs. Although its contracts with Boeing provided for no such limitation, its proposed redetermined prices submitted for the redetermination negotiations included a profit equal to 10 percent of proposed target costs. Temco's proposed per unit price for the first B–47 fuselage contract with Boeing was $66,172.44; as a result of redetermination, such price was set at $59,507.[8]

Boeing had manufactured the fuselages, and Lockheed the wing sets, and thus each had knowledge of its own costs against which it could compare Temco's cost estimates. In addition, both Temco and the prime contractors had knowledge of Temco's cost experience on production occurring while the redetermination negotiations were taking place. Temco's representatives in redetermination negotiations were people with little or no previous experience with such negotiations.

ADDITIONAL FINDINGS WITH RESPECT TO THE SPECIFIC STATUTORY CRITERIA [9]

1. *Efficiency.*—During 1952 and 1953, Temco had a very good reputation for efficiency, quality, and cost-consciousness and cost-reduction among its employees, prime contractors, and competitors. Temco's management was constantly looking for, and finding, ways of reducing labor costs, and it maintained close supervision and control over material costs. Because of Lockheed's heavy production, it was necessary that deliveries from subcontractors be neither too early nor too late. During 1952 and 1953, Temo, like most of Lockheed's subcontractors, complied completely with its delivery schedule. The quality of its products was good.

2. *Reasonableness of costs and profits (sec. 103(e)(1)).*—In 1952 and 1953, the American Car & Foundry Division of ACF Industries, Inc., manufactured the fuselage sections for the B–47 aircraft, under an FPR contract with Douglas Aircraft. This unit was identical with that produced in those years by Temco for Boeing for redetermined prices of $59,507 per unit and $49,078 per unit. American Car & Foundry's redetermined price per unit was $105,300. Of this figure, approximately $430 per unit was attributable to depreciation on American Car & Foundry's plant and equipment employed in the production of the fuselage sections. The Douglas contract represented American Car & Foundry's first endeavor in airframe construction.

Temco's competitors considered it to be the "company you had to beat" in the competition for airframe subcontract work.

---

[8] The record is ambiguous as to the prices submitted by Temco with respect to redeterminaiton of other contracts; accordingly, we can make no finding with regard thereto.

[9] The categorizing of specific facts under a specific statutory criterion is for purposes of exposition only. Our decision as to Temco's position with respect to the various statutory criteria are based on all the relevant facts, not simply those situated in these findings under a specific heading.

3. *Net worth and source of public and private capital (sec. 103(e)(2)).*—Temco's balance sheets as of December 31, 1946 through 1953, showed the following assets, liabilities, and net worth:

TABLE X

| | 1946 | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 |
|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | |
| Current assets: | | | | | | | | |
| Inventory | $1,935,370 | $834,658 | $736,296 | $1,001,746 | $2,428,987 | $4,842,886 | $7,331,725 | $7,266,126 |
| Others | 969,660 | 684,369 | 2,312,877 | 2,587,322 | 3,652,155 | 8,150,756 | 9,227,024 | 14,246,468 |
| Fixed assets: | | | | | | | | |
| Land | | | | | | | | 108,739 |
| Building and improvements | | | | | | | | 969,859 |
| Machinery, tools, and equipment | 68,575 | 104,226 | 117,808 | 142,086 | 199,547 | 233,313 | 316,076 | 1,136,053 |
| Less depreciation | (14,736) | (51,695) | (53,040) | (74,091) | (100,052) | (123,037) | (163,335) | (825,319) |
| Total | 53,839 | 52,531 | 64,768 | 67,995 | 99,495 | 110,276 | 162,741 | 1,389,332 |
| Other assets | 21,993 | 35,828 | 123,693 | 236,320 | 1,012,050 | 1,127,004 | 626,644 | 162,714 |
| Total assets | 2,980,863 | 1,607,385 | 3,237,534 | 3,843,383 | 7,192,687 | 14,230,921 | 17,348,134 | 23,054,640 |
| **Liabilities** | | | | | | | | |
| Current | 2,565,945 | 821,809 | 2,100,620 | 1,940,446 | 4,368,194 | 11,033,526 | 13,278,847 | 15,626,547 |
| Long term | | | | | 600,000 | 450,000 | 300,000 | 550,100 |
| Total liabilities | 2,565,945 | 821,809 | 2,100,620 | 1,940,446 | 4,968,194 | 11,483,526 | 13,578,847 | 16,176,647 |
| **Net worth** | | | | | | | | |
| Preferred stock | 375,000 | 375,000 | | | | | | |
| Common stock | 49,620 | 49,620 | 49,620 | 447,880 | 895,760 | 895,760 | 1,074,912 | 1,676,921 |
| Capital surplus | | | | | | | 467,750 | 850,573 |
| Earned surplus | (9,702) | 360,957 | 1,087,294 | 1,455,057 | 1,328,734 | 1,851,636 | 2,226,625 | 4,350,498 |
| Total net worth | 414,918 | 785,577 | 1,136,914 | 1,902,937 | 2,224,494 | 2,747,396 | 3,769,287 | 6,877,993 |
| Total liabilities and net worth | 2,980,863 | 1,607,385 | 3,237,534 | 3,843,383 | 7,192,687 | 14,230,921 | 17,348,133 | 23,054,640 |

Lockheed considered Temco's prices reasonable, and, after Temco had gained experience in producing the products called for under the Lockheed subcontracts, considered Temco's overall costs, and particularly overhead, to be low.

During the years 1951, 1952, and 1953, Temco received progress payments from its customers which represented partial advance payments for products not yet delivered. Under the terms of Temco's various renegotiable contracts and subcontracts, the United States acquired title to all inventory of raw materials and work-in-process on hand under any contract or subcontract with respect to which any progress payment was made. Thus, the value of the inventory to which the United States acquired title exceeded the amount of the progress payments, because progress payments were not more than 90 percent of the inventory. During 1952, the average balance of progress payments which Temco had received at any given point of time for undelivered inventory was $8,092,325, and during 1953, such average balance was $9,538,826. The balance of such progress payments on hand was as of December 31, 1951, $8,124,229; 1952, $5,912,084; and 1953, $6,180,784. The aggregate inventories owned by Temco and the United States, and on hand at Temco on such dates, were greater than the amounts shown on Table X, because such balances were subtracted from the aggregate inventory in computing the Table X inventory.

Temco used Government-owned machinery and equipment in performing renegotiable contracts and subcontracts during 1952 and 1953. Some of such equipment was acquired under a facilities prime contract; some in connection with its original 1946 lease of a portion of the former North American Aviation plant; and some from the Army-Navy reserve pool. The Government charged Temco no rent for the machinery and equipment acquired under the facilities prime contract or from the Army-Navy Reserve Pool. The original cost of the Government-owned machinery and equipment on hand and in use by Temco at December 31 of each of the years 1951, 1952, and 1953, was as follows:

TABLE XI

| | Dec. 31— | | |
| --- | --- | --- | --- |
| | 1951 | 1952 | 1953 |
| Under facilities prime contract | $1, 878, 536 | $4, 123, 388 | $7, 160, 192 |
| From Army-Navy reserve pool | 885, 669 | 913, 659 | 4, 626, 302 |
| Total nonrent | 2, 764, 205 | 5, 037, 047 | 11, 786, 494 |
| Under 1946 lease | 930, 630 | 930, 630 | 930, 630 |
| Total | 3, 694, 835 | 5, 967, 677 | 12, 717, 124 |

4. *Risk assumed* (*sec. 103(e)(3)*).—One of Temco's prime contractors, Lockheed, required it to meet demanding delivery schedules, under which delivery could be neither late nor early, since Lockheed was operating at a high rate of production.

Temco's renegotiable contracts and subcontracts required it to guarantee completely the quality of its products. The risk inherent in such warranties was increased by the fact that extremely close tolerances were required in its products. These renegotiable contracts and subcontracts further provided that they could be terminated if the Government or the prime contractor deemed termination to be in its best interest. In such event, Temco was to be reimbursed for its costs, and paid a reasonable profit, on the work done prior to termination. During 1953, one of Temco's prime contracts with the U.S. Government and one of its subcontracts with Douglas were so terminated, because of revisions of Government requirements with respect to items called for under the contract and not through any fault or default on Temco's part. As shown in Table VI, Temco's books show a profit in 1953 with respect to such contracts.

Temco's "backlog" on contracts and subcontracts for renegotiable business, as of December 31, 1951, 1952, and 1953, was approximately $120 million, $270 million, and $104 million, respectively.

In February 1953, Temco committed itself to make voluntary refunds to Boeing of $1,400,000 and to Consolidated-Vultee of $455,000. These refunds reflected Temco's determination that it could perform work under renegotiable contracts with those companies for less than the prices fixed under such contracts.

5. *Contributions to the defense effort* (*sec. 103(e)(4)*).—The Boeing B-47, the Lockheed P2V, the Douglas A2D, and the Martin P5M aircraft were weapons of great strategic importance to the nation's defense in 1952 and 1953, and the manufacturing work on such aircraft was of a high priority nature.

Temco cooperated fully with the Government and its prime contractors in the performance of its contracts. It also provided substantial technical assistance to American Car & Foundry with regard to the fuselage section for the B-47 under a contract which allowed Temco a profit on such services. This assistance placed an added burden on Temco's operations.

6. *Character of the business, etc.* (*sec. 103(e)(5)*).—During the years 1952 and 1953, Temco was an important subcontractor in the aircraft industry. Its operation primarily involved multiple manufacturing, fabricating, engineering, and assembly functions with respect to aircraft. The various products manufactured under its renegotiable contracts and subcontracts were highly complex and had

to be manufactured to close and precise tolerances. The manufacturing and recordkeeping techniques required by its many different customers varied considerably from one to another. In the case of the contracts for B-47 fuselage sections, P2V wings, and A2D assemblies, Boeing, Lockheed, and Douglas supplied Temco with detailed design drawings, plans, specifications, and engineering data for which no specific charge was made. However, during the life of a particular contract, many engineering changes were made in the specifications which Temco had to incorporate into its production. Temco's contracts provided for adjustments in the purchase price to reflect the cost of substantial changes and the redetermined prices included a flat allowance to cover the cost of other changes.

OPINION

Pursuant to section 108, the petitioner seeks a redetermination of the respondent's finding that Temco realized excessive profits on contracts subject to renegotiation of $750,000 in 1952 and $3,500,000 in 1953. The respondent, by its amended answers to the petitions, now claims that Temco realized excessive profits of $2,300,000 in 1952 and $5,250,000 in 1953. Having already resolved the preliminary accounting issues in the case, we still have remaining the question of whether Temco's profits in 1952 and 1953 were excessive. The petitioner has the burden of proving that the amount of excessive profits realized by Temco in 1952 and 1953 was less than the amounts found by the respondent. On the other hand, the respondent has the burden of proving that Temco realized the increased excessive profits claimed in the amended answers. *Nathan Cohen* v. *Secretary of War, supra.*

Virtually all of Temco's business consisted of work done under renegotiable contracts with the Government or renegotiable subcontracts with the Government's prime contractors, relating to aircraft needed by this country in the Korean conflict. In 1952, Temco realized profits subject to renegotiation of $4,830,127—which amounted to a return of 175.6 percent on opening book net worth, a 9.7-percent return on renegotiable sales, and a 10.7-percent return on costs of renegotiable sales. In 1953, it realized total renegotiable profits of $9,142,395—a return of 242.6 percent on opening book net worth, a 13.1-percent return on renegotiable sales, and a 15.1-percent return on costs of renegotiable business. The respondent would have us determine Temco's allowable profit for 1952 to be $2,530,127—a 91.1-percent return on opening book net worth, a 5.3-percent return on sales, and a 5.6-percent return on costs; and determine its allowable profit for 1953 to be $3,892,395—a 103.3-percent return on opening book net worth, a 6-percent return on sales, and a 6.4-percent return on costs.

The Renegotiation Act exists in recognition of the fact that the exigencies of defense procurement may, particularly in wartime, prevent the close pricing of contracts which would occur under normal market conditions. With the defense effort requiring great quantities of material, much of it new and different from the contractor's normal production, and demanding it quickly under tight delivery schedules, there may be neither the time nor the available data with which to develop cost estimates of the accuracy to be expected under usual business conditions—

and, therefore, * * * close initial pricing will be almost impossible to achieve. Nevertheless, the procurement of needed military supplies and equipment cannot be delayed for the completion of cost and price analyses that might otherwise be made as an incident to careful purchasing. * * * [H. Rept. No. 7, to accompany H.R. 1724 (Pub. L. No. 9), 82d Cong., 1st Sess., p. 2 (1951).]

See Braucher, "Renegotiation Act of 1951," 68 Harv. L. Rev. 270 (1952). Accordingly, the Act requires a second look, after the results of contract performance are in, in order to correct pricing errors. The purpose of the Act is thus to insure that the Government pays a net price equivalent to what it would have paid if the contracting parties had had the benefit of accurate cost estimates and enough time to negotiate a reasonable price. Appropriate prices include an allowance for reasonable profits. However, if the contractor's profits are excessive, the Act proceeds on the premise that the excess is a windfall resulting from the inability to fix prices in the customary manner and should therefore be recaptured by the Government.

The decision as to the existence and amount of excesive profits is to be reached on the basis of objective business judgment (H. Rept. No. 1724, *supra*), and the Act provides a number of criteria to be considered in making that judgment, criteria by which the decision-maker is to make an *ex post facto* determination of the price and profits which would have obtained in normal economic circumstances. The criteria are of necessity general. As in a normal market, so under the Act, different factors have different relevancy and weight in different situations. The parties to a renegotiation proceeding must present to this Court the facts relevant to the contractor's performance. They must also present sufficient information as to the relevant industry norms to enable this Court to determine the appropriate standards against which the contractor's performance under each criterion is to be evaluated. Finally, they must provide us with sufficient information that we may determine what weight the contractor's comparative performance under each criterion is to be given, in the particular case, in reaching our ultimate decision.

The amount of excessive profits, if any, realized by Temco on its renegotiable contracts in 1952 and 1953 is to be determined—

with respect to the aggregate of the amounts received or accrued during * * * [each] fiscal year * * * under contracts with the Departments and subcontracts, and not separately with respect to amounts received or accrued under separate contracts with the Departments or subcontracts * * * [Sec. 105(a)]

Under section 103(e)(5), we are to consider:

(5) Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turn-over;

In *North American Aviation, Inc.* v. *Renegotiation Board*, 39 T.C. 207, 230 (1962), we said of the character of North American's business:

It is well established in the record that the manufacturing of airplanes of the types petitioner furnished, is a complex and difficult business. * * * In all of its manufacturing activities, including its guidance systems, its production operations necessitated precision work with a flexible manufacturing operation that would allow changes for application of new and improved techniques. * * *

Many of the same things can be said of Temco's business. During 1952 and 1953, Temco was an important subcontractor in the airframe industry. The components and assemblies manufactured by Temco were extremely complex and required close tolerances. It too had to be, and was, prepared to accommodate to a myriad of engineering and design changes. Moreover, since Temco was a subcontractor, its manufacturing and recordkeeping operations had to be accommodated to the different requirements of its various customers, and thus, Temco's operations were significantly more complex than those of a manufacturer of standardized products or of few customers. The respondent points out that the Board's regulations speak in terms of *relative* complexity and argues that Temco's operations were less complex than those of Boeing or North American. The record contains no evidence to that effect, and our findings in the cases involving those companies are not sufficient to enable us to make such a judgment.

The respondent correctly observes that the petitioner has introduced no evidence and made no argument that Temco is entitled to favorable consideration on the issues of "source and nature of materials" and "character and extent of subcontracting." It argues that Temco is entitled to unfavorable consideration on the "rate of turnover" subfactor, noting that Temco's sales in 1952 and 1953 were 18.1 and 18.9 times opening book net worth. It correctly observes that this high rate of capital turnover was due to Temco's unusually low invested capital and its use of Government capital in the performance of its renegotiable business. Such fact, however, has more relevance to, and will therefore be discussed in connection with, the net worth and source of capital criterion of section 103(e)(2).

Dividing the total cost of Temco's sales by its average inventory during 1952 and 1953 yields rates of inventory turnover of 3.5 and 4.7 times. Dividing sales by average inventory yields turnover figures of 3.8 and 5.3 for those years. In view of the fact that an exhibit introduced by the respondent shows that the average ratio of sales to average inventory for 50 large American corporations was 6.2 and 6.6 in those years, we cannot say that Temco must be given unfavorable consideration under this criterion by reason of its rate of inventory turnover.

Table V shows a significant manufacturing contribution to purchased material (see sec. 1460.14(b) (4), R.B. Regs.), and we conclude that Temco's performance with regard to the rate of turnover subfactor is entitled to favorable consideration.

Taking into consideration the complexity of aircraft manufacture, the particular difficulties engendered by Temco's role as a subcontractor, and the substantial value that it added to the products which it produced, we conclude that Temco is entitled to favorable consideration under section 103(e) (5).

Section 103(e) (4) directs us to consider:

(4) Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;

*Boeing Co. v. Renegotiation Board, supra, North American Aviation, Inc. v. Renegotiation Board, supra,* and the record in this case establish without question that the aircraft industry made valuable contributions to the national defense during the Korean emergency, through its development, production, and delivery of aircraft of great strategic importance. The record further demonstrates that Temco, as an important manufacturer of vital aircraft components and subassemblies, played a significant role in this effort. That it did so in a spirit of the fullest cooperation with the Government, its prime contractors, and, when called upon to do so, with its competitors, is a conclusion amply supported by the testimony in the case. However, the record does not disclose that Temco made unusual inventive or developmental contributions, or improvements in techniques and processes which could be termed exceptional. Sec. 1460.13 (b), R.B. Regs. With respect to most of Temco's renegotiable business, the prime contractors had previously developed and built the item subcontracted to Temco, and they supplied Temco with designs, drawings, plans, specifications, and engineering data. Temco did supply valuable technical assistance to American Car & Foundry in the production of the fuselage section; however, it did so under a profitable assistance contract, and there is no indication in the record that this assistance had a detrimental effect on Temco's future business. Compare *Boeing Co.* v.

*Renegotiation Board*, 37 T.C. at 643. For these reasons, we believe that Temco's contribution to the defense effort was commendable, but is of little signficance to our decision in this proceeding.

Section 103(e)(3) requires that we consider: "(3) Extent of risk assumed, including the risk incident to reasonable pricing policies."

The question of the risks incurred by Temco in the performance of its renegotiable business is one of the most important, and most sharply contested, in this case. Although both parties raise many factors bearing on this question, the most argued matter was the degree of risk Temco assumed under its fixed-price redeterminable contracts, contracts which accounted for 53.7 percent of its renegotiable business in 1952 and 52.2 percent of its renegotiable business in 1953.

The respondent argues that Temco incurred no risk of monetary loss with respect to its FPR contracts for two reasons: First, because the very nature of an FPR contract precludes a significant risk of loss; and secondly, because, in any event, under the circumstances surrounding Temco's contracts, there was no such risk.[10] The petitioner contests both arguments.

The parties have compared the risks involved in the FPR contract with those involved in other types of contract. The petitioner argues that the FPR contract is very similar in risk to a fixed-price contract, in which the price is set at the beginning of the contract so that the seller bears the entire risk that actual costs will exceed the estimated costs. The respondent, on the other hand, suggests that the FPR contract is similar in effect to the incentive contract. As a matter of theory, we think that the FPR contract has more in common with the fixed-price contract. Under both, the degree of risk of loss depends upon the accuracy of the cost estimate on which the final price is based. Under both, the seller bears the entire risk that the estimate is too low, but he also receives the entire benefit when the estimate is too high. The only difference between the two types of contract is that in the fixed-price contract the price is determined without the benefit of any experience under that contract, whereas in the FPR contract, the final price is not fixed until there has been some experience in production under that contract. On the contrary, in the incentive contract, the risk of loss and the benefit of an overestimate are both shared by the seller and the buyer, the buyer having the major share. We think that, as a matter of abstract analysis, the FPR contract imposes a signifi-

[10] The parties agree that, for purposes of the present question, the relevant consideration is whether Temco incurred a risk of actual loss on the contracts. Under any contract, even a CPFF contract, there may be the risk that the contractor's rate of profit may be less than its average rate on all business, or the industry average, or some other relevant standard. Consideration is given to this kind of risk, however, under other sections of the statute, particularly sec. 103(e)(1), relating to reasonableness of costs and profits.

cantly greater degree of risk on the seller than does the incentive contract, a risk more akin to that of the fixed-price contract.

The respondent then argues that, despite what abstract analysis might indicate, any such risk was negated in the present case. It contends first that because costs were estimated in redetermination negotiations with the benefit of experience on substantial prior production, the risk that such estimates would be too low was substantially reduced. Secondly, it urges, the cost estimates which Temco submitted at the redetermination proceedings were so overstated, as compared with its actual experience on the prior production, that it thereby totally insulated itself from risk of loss. The petitioner disputes both contentions.

We conclude that on the contracts with Boeing, Lockheed, and Douglas, Temco's substantial cost experience prior to redetermination was sufficient to provide it with data on which to base reasonably accurate estimates of future costs. [11] Furthermore, the items produced by Temco, although technically complex, were not new; the items for Boeing and Lockheed had previously been manufactured by those companies. There was little likelihood of radical design changes leading to substantial cost increases. It is true that Temco had to cope with a myriad of engineering changes during the life of each of its contracts, which led to increases in costs. However, since the contracts provided for adjustments in the purchase price to reflect the cost of substantial changes, and since the redetermined prices included a flat allowance to cover the cost of other changes, they did not contribute materially to the risk of loss.

The estimates of total costs depended in large part on the application of a learning curve to the costs incurred prior to redetermination. The learning curve is based on the assumption, which has been shown to be fairly accurate in the airframe industry, that as production increases, production costs decrease in a regular fashion, because of "learning," improvement in production methods, and efficiency. Hirschmann, "Profit From the Learning Curve," 42 Harv. Bus. Rev., No. 1, p. 125 (Jan.–Feb. 1964); Andress, "The Learning Curve as a Production Tool," 32 Harv. Bus. Rev., No. 1, p. 87 (Jan.–Feb. 1954). The petitioner argues that prices based on such an assumption carry the risk that costs will not actually be reduced in accordance with the learning curve; however, it introduced no evidence in support of such argument. We cannot, therefore, agree that this assumption as to continuing cost reduction imposed risks on Temco greater than those created by the nature of the FPR contract.

The respondent contends that Temco's cost estimates were so overstated as to negate all pricing risk. The bulk of its argument rests on

---

[11] We do not find helpful the petitioner's suggestion that we should consider separately sales under FPR contracts occurring prior to, during, and after redetermination.

the assertion that the learning curves used by Temco in the preparation of its cost estimates did not accurately reflect either its own cost performance on prior production or that of the industry as a whole. The respondent argues that the learning curves used by Temco were flatter—i.e., showed a lesser degree of cost reduction as production increased—than was justified.

The interpretation of learning curves and the applicability of the evidence concerning them to the issues in this case has been of great concern to this Court inasmuch as the parties, particularly the respondent, relied heavily on the learning-curve evidence to support their contentions not only under the risk criterion, but also under the criteria concerning efficiency and the reasonableness of costs and profits. Nevertheless, we have concluded that the evidence presented to us is insufficient to be helpful in this case.

First, the parties are in complete disagreement as to exactly what a learning curve shows. There appear to be several types of learning curves, each type showing cost reduction in a different way. Compare Hirschmann, *supra*, and Andress, *supra* at 88, with *id.* at 88–89 and *Boeing Co.* v. *Renegotiation Board*, 37 T.C. at 625. We are presented with several learning curves—Temco's, Boeing's, the "aircraft industry's"—but are not told what type each one is. Moreover, we do not know whether such curves are derived from comparable ranges of cost experience. Nor do we know whether Temco's operations, and the relative amounts of labor and capital employed in its business, are such that its learning experience should be the same as that of prime contractors in the industry or of the "aircraft industry" as a whole. Finally, the learning curves other than Temco's own are not in evidence in the present case; the respondent in his brief refers to the evidence presented and findings made in the *Boeing* case, and apparently asks us to take judicial notice thereof. The petitioner objects to our doing so on grounds of irrelevancy, and in view of the difficulty we would face in interpreting such data if it were before us, we decline to take such judicial notice. Furthermore, the same difficulties dissuade us from attempting to make any findings based on Temco's own actual and projected learning curves.

The respondent seeks support for its contention that the cost estimates were inflated by an *ex post facto* look at the profits Temco actually made on its FPR contracts. It points out that in 1952 and 1953, Temco's profits as a percent of actual costs were 16.9 percent and 32.1 percent, respectively.[12] It argues that the parties to the contracts in-

---

[12] Such figures do not reflect our decisions in Temco's favor on the accounting issues, inasmuch as we have no basis for determining what part, if any, of the Buckaroo expenditures and profit-sharing plan contributions are properly allocable to FPR contract costs. However, the error in the respondent's percentages thereby engendered does not significantly affect its argument.

tended that Temco's return should be limited to 10 percent of costs and that accordingly Temco's actual profits were clearly excessive. The petitioner first rejects the statement that the parties to the contracts intended that Temco's profits should be limited to 10 percent of *actual* costs, and then goes on to argue that the differences between estimated and actual costs were due not to overestimation but rather to. Temco's "fanatical cost reductions" attained through highly efficient performance. In dealing with this argument, we do not pass on Temco's efficiency per se; we will discuss that later. The question to be considered is whether the existence and magnitude of the differences between the estimated and actual costs were consistent with close pricing under the contracts.

We cannot so find. Simple mathematical analysis demonstrates that for the 2-year period 1952–53, actual costs on FPR contracts underran estimated costs by about 12 percent.[13] The evidence presented to us does not permit us to make a finding that an underrun of this magnitude was due to unforeseeable efficiency and cost saving. Consequently, we are forced to believe that a significant part of the underrun was due to an avoidable lack of precision in the determination of estimated costs. We, therefore, agree with the respondent that the risk of loss which Temco might have incurred under its FPR contracts was reduced by its lack of "reasonable pricing policies."

The petitioner argues that Temco incurred risk of loss under its fixed-price contracts and subcontracts. Although there was some risk under such contracts, it was mitigated by the fact that prices on such contracts were set after some costs thereunder had already been incurred. Nevertheless, we conclude that Temco did incur risk of loss under its fixed-price and FPR contracts, although not as much as that claimed by the petitioner.

We cannot find that Temco incurred a significant risk of loss on its other renegotiable contracts and subcontracts during 1952 and 1953. Under its C₁ FF, facilities, and terminated[14] contracts, it was guaranteed a reimbursement of its costs. Under its incentive contracts, it bore only 5 percent of any cost overrun, the buyer bearing the balance.

The petitioner argues that Temco also incurred risks by reason of its guaranty of the quality of its products, and by reason of the possibility that the Government could have canceled its sublease with Chance Vought covering the Dallas plant. As to the first argument,

[13] This figure is based on the assumption that estimated costs included a profit factor of 10 percent of estimated costs, and does not reflect our decisions in petitioner's favor on the accounting issues (a fact which does not impair the validity of our conclusion).

[14] As discussed later, Temco did incur another kind of risk on account of terminated contracts.

it is not a sufficient answer to say, as the respondent does, that such guaranties or warranties are usual in American industry. Usual or not, Temco's guaranties of complex subassemblies, defects in which could lead to the loss of complex and expensive airplanes, must be viewed as a factor posing a substantial and continuing risk to it. On the other hand, there is no evidence that there was a reasonable possibility of the sublease being terminated during 1952 or 1953. Temco was an important subcontractor on several major defense weapons, including the B-47, which was, as we found in *Boeing*, the chief deterrent weapon possessed by the United States in 1952. It appears highly unlikely that the Government would have deprived Temco of the facility which in both 1952 and 1953 provided the greatest source of Tempo's production capability.

The petitioner also argues that there was a significant risk in the fact that Tempo's various renegotiable contracts and subcontracts could be terminated "for the convenience of the Government," without any default on its part. In spite of the fact that on such termination, Temco was entitled to reimbursement for its costs on such contracts and to profits thereon, we think that the possibility of termination was nonetheless a significant source of risk. In the event of termination, Tempo was faced with the problem either of contracting its production capability or maintaining such capability in the hope of obtaining other business. Either alternative involved risks. If the production capability was reduced, it might be impossible to make a corresponding reduction in overhead, and it would be difficult to reconstitute the production capability when additional orders were received. The risks resulting from continuing the production capability are readily apparent. That the possibility of termination was a real one is indicated by the fact that in 1953, two major contracts, one with the Navy for the production of a fighter plane and the other with Douglas for the production of subassemblies for a fighter, were terminated.

Tempo also incurred some risk in 1953 by reason of its having made early in that year voluntary refunds to Boeing and Consolidated Vultee totaling more than $1.8 million, a significant amount in comparison with its 1953 profits before renegotiation. See sec. 1460.12(b) (3), R. B. Regs.

Although we do not agree with all petitioner's claims as to the risks incurred by Temco, we conclude that Temco did incur some risk of loss in the performance of its renegotiable business and deserves some favorable consideration with respect to the risk factor.

Under section 103(e) (2), another criterion we are to consider is: "(2) The net worth, with particular regard to the amount and source of public and private capital employed."

Temco's return on book net worth was approximately 175 percent in 1952 and 240 percent in 1953. We are presented with no competent evidence showing what an average rate of return would be for a company like Temco. Although such rates may appear to be extraordinarily high, they are in fact misleading and not helpful.

Temco used a large amount of public capital in its business. It rented the major part of the fixed assets and some machinery and equipment, and the Government gave it, without charge, the use of most of the machinery and equipment it employed.

We cannot say with accuracy what amount or percentage of the total capital employed by Temco was supplied by others, because of lack of evidence. We are told the original cost of construction of the plant and equipment, but we are not told what value they had in 1952 and 1953.

Under section 103(e)(2) of the statute and section 1460.11(b)(3), R.B. Regs., a contractor using a large amount of nonprivate capital in relation to total capital employed in its renegotiable business is entitled to less favorable consideration than a contractor who uses primarily private capital. There appear to be two reasons for this. First, as we said in *Boeing*, where a contractor risks relatively little of its own capital it is primarily a manager of property, and thus not entitled to as great a return for risk-taking as a contractor which supplies its own assets. Secondly, whereas a contractor which uses its own assets is entitled to an element of return equivalent to the rental value of the assets, a contractor using the assets of others is not. For these reasons, a contractor using largely public capital—either rented property or Government-furnished property—is not entitled to as large an absolute amount of profit as a contractor using its own property.

It does not follow, as the respondent contends, that the contractor using capital supplied by others is necessarily entitled to a smaller *rate of return* on its own net worth. Profit is in part a payment to an entrepreneur for the productive use of assets. A contractor is entitled to an appropriate profit for such use based on the total capital it employs in its renegotiable business, whether the capital is owned by it or by others. Cf. sec. 1460.11(b)(3), R.B. Regs. Two companies making the same kind of use of the same amount of capital should be entitled to the same amount of entrepreneurial profit, whatever the source of such capital. However, this entrepreneurial profit will inevitably be a larger percentage of the net worth of a company using primarily public capital than one using primarily its own capital. Therefore, the total profit—the return on invested capital plus the entrepreneurial profit—will be a larger percentage of the net worth of the contractor using public capital.

Though Temco used a large amount of public capital, it organized the staff, supervised the work, and provided the know-how. We lack sufficient evidence to place a value on those contributions by Temco, but they indicate clearly that Temco is entitled to an entrepreneurial profit for such contributions and not merely to a return on its own invested capital. If we had the necessary information, it would be possible to compare the return on net worth of a company like Temco, which uses capital supplied by others, with the return on net worth of companies supplying their own capital, but that information has not been furnished us. Although the respondent has introduced information as to the returns on net worth of 50 large companies, we are unable to compare Temco's returns with those on that list, because we do not know the businesses in which those companies were engaged, whether or not they were similar to Temco's, or whether those companies supplied their own capital or used Government capital. In view of the record in this case, we cannot say how Temco's return on net worth compares with those of other companies.

We conclude, therefore, that Temco is entitled to unfavorable consideration under this criterion to the extent that it is entitled to less return on invested capital than if it had supplied all the capital it employed. However, we cannot go beyond such conclusion to say that it is entitled to unfavorable consideration merely because of its high rate of return on net worth. The record justifies no finding either way on this point.

The respondent points out that the Government or Temco's customers supplied it not only with plant and equipment, but also with working capital in the form of cost reimbursements under CPFF contracts and progress payments for work in production under other contracts. It argues that Temco was thus relieved of the cost of borrowing working capital. However, there has been no showing that any payments under the CPFF contracts were made prior to delivery of the products. The progress payments under other contracts were made prior to delivery, but after Temco had incurred the expenditures providing the basis therefor. Because of such progress payments, Temco is not entitled to prices which include amounts to cover the costs of borrowing working capital, but that fact does not justify reducing Temco's allowable profit.

The next factor to be considered is (sec. 103(e)(1)) : "(1) Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products."

Under this criterion, our principal aim, as the regulations make clear, is to compare Temco's performance during the years at issue with its performance in past years, taking into account the changes

wrought in the company's operations by its undertaking the renegotiable business, and with the performance of other companies similarly situated.

Temco's income statements (Tables IV and V) demonstrate that both the volume of Temco's business and the "mix" between renegotiable and nonrenegotiable business changed dramatically in 1951, the year of the defense buildup due to the Korean conflict. Other evidence indicates that Temco was quite a different company in 1952 and 1953 than it was in the years 1946 through 1949. In the earlier period, it was primarily an assembled work force seeking, in the words of its president, to "build anything I could find that was generally of a sheet metal nature," including popcorn machines, farm tractors, and truck bodies. Its Government aircraft work consisted almost entirely of overhauling airplanes, particularly in connection with the Berlin Airlift, rather than manufacturing. In the later period, its work was almost entirely Government business, consisting of the manufacture of precision aircraft subassemblies. It was not until the Korean conflict that Temco "found itself" and became the company whose performance we must judge in this proceeding. Consequently, Temco's past performance is comparable to its performance in 1952 and 1953 in only the most general way. The same observations are pertinent to a comparison between its performance on renegotiable and nonrenegotiable business. Such a comparison is valid only insofar as one type of work "of a sheet metal nature" is comparable with a different type of such work—e.g., as building popcorn machines compares with building aircraft wings or fuselages, or as manufacturing small private aircraft compares with manufacturing bombers and fighter planes.

With these caveats in mind, it is nevertheless interesting to note that from its inception Temco's profit performance was somewhat better than might be expected. The respondent points out that its renegotiable profits as a percentage of that part of book net worth allocable to renegotiable business averaged 58 percent, in an effort to show that its return in 1952 and 1953 was excessive; the petitioner counters with the observation that Temco's nonrenegotiable profits for those years averaged 210 percent of net worth employed in nonrenegotiable business. The respondent notes that Temco's profits on renegotiable business averaged 5.3 percent of costs in 1948 through 1951; whereas, the comparable figures as we have found, were 10.7 percent for 1952 and 15.1 percent for 1953. The petitioner argues that such figures were considerably less than Temco's average profit on nonrenegotiable business of 24.1 percent of costs for 1948 through 1951. It further argues that because Temco's renegotiable business prior to 1951 consisted largely of work done under relatively riskless CPFF contracts, the profits thereon would be expected to be less than those earned under later contracts of a riskier nature.

On balance, we think that the inferences to be drawn from the evidence of Temco's performance in prior years are so conflicting as to be of little independent aid in reaching our decision. Both the volume and nature of Temco's business—renegotiable and nonrenegotiable—in years prior to 1952 were sufficiently different from its business in 1952 and 1953 that we do not consider evidence of performance in those years very helpful in deciding the present issues.

In attempting to show that Temco's costs and profits were reasonable, the petitioner relies heavily on the fact that prices charged to Boeing by Temco for the B-47 fuselage section were $60,000 under its first contract and approximately $50,000 under the second contract; whereas, another subcontractor, building the same item for Douglas, sold it for $105,000 per unit. Although these figures compare *prices*, rather than costs or profits, they have some relevancy to the issue of reasonableness of costs and profits, and entitle the petitioner to receive some favorable consideration. However, we do not have the evidence to find to what extent the difference arose because of Temco's superior performance, and to what extent it is explained by the fact that the competitor, unlike Temco, was neither experienced in, nor primarily equipped for, the manufacture of precision aircraft equipment. Moreover, such figures refer to only a part of Temco's renegotiable business; we have no figures on which to make comparisons with Temco's costs and profits under other contracts.

Finally, we have evidence that Temco's prime contractors considered its costs and profits to be reasonable, and that its competitors considered it to be the "company to beat" in bidding for airframe subcontracts. Although this evidence was general, not based on specific information, it was uncontradicted and is entitled to some weight.

The question of the reasonableness of Temco's profits is too closely tied with the question of the existence and amount of excessive profits to be considered separately from that question. See *North American Aviation, Inc.* v. *Renegotiation Board, supra* at 228. Our ultimate decision itself reflects our conclusion, upon consideration of all relevant facts, that Temco's profits were to some extent unreasonable.

Section 103(e) of the Act specifically requires that we give:

favorable recognition * * * to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower; * * *

With respect to the attainment of quantity and quality production, Temco must receive favorable consideration. The total volume of its business in 1953 was almost six times its volume in 1950, and twice its volume in 1952—the increases being due almost entirely to increases in its renegotiable business, while the quality of its products was good.

The respondent is correct in noting that the Government provided a large portion of the facilities used to attain this increase in production, but this does not obviate the fact that it was Temco's personnel and Temco's efforts which made use of such facilities to the benefit of this country's defense effort.

On the question of cost reduction, we are unable to make a specific finding because of the absence or ambiguity of the learning-curve data described earlier. Temco, like the industry in general, achieved cost reductions as production progressed, but whether its reduction was greater than, equal to, or less than the average, we cannot say. The mere existence of some cost reduction, in an industry where cost reduction is the rule, is not a fact sufficient to enable us to find that Temco merits favorable consideration on this point. Cf. *Vaughn Machinery Co.* v. *Renegotiation Board*, 30 T.C. 949, 961 (1958), affd. 273 F. 2d 235 (C.A. 6, 1959).

Because, for reasons stated earlier, we are unable to establish from the evidence the value of the facilities used in Temco's business during 1952 and 1953, or for prior years, we are unable to determine whether Temco was economical in the use of materials or facilities. However, efforts toward economy in the use of manpower was a principal concern of Temco under the guidance of Robert McCulloch, and the record amply demonstrates that such effort was successful. From 1950 through 1953, Temco's total output per employee increased; its output per employee in 1953 was more than 1½ times what it was in 1952 and more than twice what it was in 1951. Temco is entitled to favorable consideration in regard to its use of manpower.

The record contains a great deal of opinion testimony of employees, competitors, and prime contractors to the effect that Temco was a very efficient company. However, such testimony was highly impressionistic; the respondent's cross-examination of the witnesses ably brought out that their opinions were based on no solid comparisons with the performance of other companies. Consequently, while we do not discredit this testimony altogether, it adds little to the favorable consideration for efficiency to which we have already found Temco to be entitled.

Finally, we are faced with the ultimate question—the existence and amount of any excessive profits realized by Temco in 1952 and 1953. We have made a thorough and independent analysis of the record and the arguments presented in this case. We have carefully considered Temco's performance under the statutory criteria, keeping in mind the factual approaches taken and the legal precedents set in our prior decisions, including particularly *Boeing* and *North American.* As a result of such investigation, we have not been able to find on this record any error in the amounts of excessive profits determined by the

410

Renegotiation Board. We have found that Temco is entitled to favorable consideration by reason of the risks that it assumed, the character and complexity of its business, and its efficiency. The petitioner argues that it is entitled to more favorable treatment than this Court allowed Boeing and North American. However, the original determinations of the Board are more favorable than we allowed in the *Boeing* and *North American* decisions, and the petitioner has failed to carry its burden of showing us that it is entitled to even more favorable treatment. On the other hand, the respondent has failed to convince us that Temco realized excessive profits in greater amounts than were determined by the Board.

Accordingly, under all the facts and circumstances, we conclude that Temco realized excessive profits of $750,000 in 1952, and $3,500,000 in 1953.

*Decisions will be entered accordingly.*